## STATE *v.* CHARLES ROWE.

(Filed 17 May, 1911.)

1. **Appeal and Error—Courts—Improper Remarks—Prejudice Not Shown.**

   A remark by the trial judge to the sheriff in the presence of the jury upon a trial for homicide, after four counsel had addressed them, the last being one of the defendant's, "You can give the jury water. And, gentlemen of the jury, if you wish to retire to your room you can do so for a few minutes. We have no band to play between the speeches," makes it incumbent upon the complaining party to show that it was prejudicial, and, nothing else appearing, it does not constitute reversible error.

2. **Homicide — Provocation—Words Spoken—Conditions—Questions for Jury.**

   Upon a trial for a homicide, when unfriendly relations have been shown to have previously existed between the prisoner and deceased, and each had been told by the other never to speak to him again, the disagreement having arisen from the deceased's driving over the clover patch of the prisoner along the side of a road, where the deceased had been forbidden by the prisoner to drive, it is for the jury to say, under the plea of self-defense, and under all the facts and circumstances, whether the prisoner's words first spoken to deceased, "You are not doing what you promised to do, keeping off the clover," were sufficient to provoke an assault made by the deceased upon him, resulting in a fight causing the death of the former.

3. Instructions—Prayers—Substance Given—Appeal and Error.

When the trial judge instructs the jury substantially as requested in special instructions, it is sufficient.

4. Homicide—Self-defense—"Sudden"—Words and Phrases—Harmless Error.

A charge by the trial judge to the jury following in other respects the principles of law applicable to self-defense, upon a trial for a homicide, is not erroneous because of an instruction that if the assault on the prisoner was "sudden, serious, and continuous," he had the right to kill in defense of his person, the instruction being favorable to the prisoner.

5. Same—Elements of Self-defense.

An instruction that the prisoner upon trial for homicide under the plea of self-defense had a right to stand his ground and resist the attack upon him, even to the slaying of his adversary, provided the assault was "sudden, serious, and continuous," is erroneous, for it leaves out of consideration the question as to how serious the assault was, and as to whether the deceased intended to kill or to inflict great bodily harm, or whether at the time the assault was made it was calculated to excite in the prisoner's mind a reasonable apprehension of death or great bodily harm; but the error being in favor of the prisoner, he has no right to complain on appeal.

6. Homicide—Deadly Weapon—Presumptions—Burden of Proof.

The killing with a deadly weapon raises at least the presumption of murder in the second degree, placing the burden upon the prisoner to satisfy the jury that such facts and circumstances of mitigation or justification existed as will excuse the homicide or reduce its grade to manslaughter.

7. Same—Manslaughter—Harmless Error.

When the jury upon a trial for homicide with the plea of self-defense interposed, have, upon sufficient evidence, accepted the theory of the State, that the prisoner did not kill in self-defense, and it appears that he used a deadly weapon, and slew the deceased with it, a verdict for manslaughter was not improper.

8. Same—Evidence.

In this case there was evidence that the prisoner pursued and killed the deceased by firing a shotgun at him without any real or apparent necessity for the act as a measure of self-defense, that being the only plea interposed; that he twice snapped the gun at the 16-year-old son of deceased; that neither the deceased nor his son was armed; that the prisoner and his brother, who was with him, then ran away, giving as the reason for

their sudden flight, which the jury rejected, that they were afraid that the boy would shoot them with a pistol; they said he had one, which he did not have. *Held*, a conviction for manslaughter would not be disturbed on appeal, the trial in other respects being free from error.

APPEAL from *Pell, J.,* at the November Term, 1911, of MITCHELL.

The defendants, Charles Rowe and Wesley Rowe, were indicted for the murder of Filmore Rose. Wesley Rowe was acquitted and Charles Rowe was convicted of manslaughter. The killing was admitted by the defendant Charles Rowe, his plea being self-defense. The evidence is voluminous, but for the purpose of considering the exceptions the following statement of facts and a portion of the evidence will suffice:

The deceased, whose wife was a first cousin of the prisoner, had in cultivation a field about a mile from his home, and in order to reach the field it was necessary for him to go over an old road, which was used by the public at will, across the property of the defendant. At one place the road was rough and difficult to pass. The deceased, on one or two occasions, drove a little out of the usual bed of the road, allowing his wagon to run over the land and clover of the defendants. On the morning of the homicide the two defendants left home early, about 7 o'clock, one with an axe and the other with a gun, to place some poles along the road to prevent trespassing, as they alleged. From this point, the evidence of the State and the defendant conflicts.

The State's witness Avery Rose, the 16-year-old son of the deceased, and the only one present at the homicide, except deceased and two defendants, testified: "Thursday morning father and I started to the field; got outside of Charlie Rowe's field and quite a distance from us we saw Charlie Rowe and Wesley Rowe standing on a high knoll, about 125 yards away."

Q. Were they on or near this road you were traveling? A. Yes, sir; up on a knoll, looking down the road towards us. We went on and met them; as soon as we got in sight they came towards us.

Q. What did they have in their hands? A. Wesley had a gun and Charlie Rowe had an axe.

Q. What kind of gun was it?   A. A double-barrel shotgun. Charlie had the axe.   My father went up and said, "Good morning" to them, and they didn't speak to him.   Charlie said: "Now, look here, Filmore, you have run over my clover and grass.   If you don't drive down there in the road I am going to put the law to you."   Father said: "Charlie, clean out those stumps over there and fix the road so I can drive it, and I will do so."   Father went on up the road, Charlie following father; Wesley following Charlie.   I was behind my father.   Father went on up the road.   Charlie turned around to Wesley, handed Wesley the axe; Wesley handed him the gun.   I then turned and saw there was trouble.   I made for the gun and Charlie knocked me down with the gun and run on around and shot my father.   He struck me above the right ear—side of the head. After he shot my father, he turned and snapped twice at me as I went to my father.

Q. Then what happened?   A. They ran; went back down the road.

The witness further testified that neither he nor his father had a pistol or other weapon of any kind, and there was no evidence that one was found on the body.   The wife of the deceased   testified that deceased had not had a pistol for over twenty years.

The appellant testified in his own behalf, and after telling about going to the place of the homicide, on the morning when they met, and doing a little work on the road, continued as follows: "I was just on the bank of the road, just in the edge of the clover."

Q. Did any one speak?   A. I was throwing the stones out and making a racket just as they got up there and didn't hear any one speak.

Q. What was the first word spoken there that you heard?   A. Just at that time they were up to us and were just passing us, and I spoke and said: "Filmore, you are not doing what you promised you would do, keeping off the clover."   Just at that time, he spoke and cursed me (using offensive and insulting language).

Q. How far away from you was he when he said that? A. Two or three steps away.

Q. What happened when he used the language you have mentioned? A. Just when he used the language I have mentioned, I had seen his hand in his pocket all the time, from the time he came up, and just at that time he stooped and picked up a stone with his left hand, his right hand being in his right pocket, and Avery stooped and picked up two, a stone in each hand. Just at that time Avery rushed at me, wildly, furiously, with the stones. As he rushed at me he saw the axe and he dropped the stones and grabbed the axe.

Q. Then what did he do? A. Just as he grabbed the axe he was getting very close to me and made a blow at me with the axe, and I dodged him, the handle striking me on the left shoulder, jerking the axe out of his hand. I gave back three or four steps from him and by then I had gotten to where my brother had stopped and was standing with the gun on his shoulder; that was my brother Wesley. As the blow came and I dodged it, I was right at my brother and I reached and took the gun off his shoulder and smashed him around the side of the neck or head; it staggered him considerably; he didn't fall.

(Here witness indicates position of parties).

Q. When you struck him with the gun, what did you say, if anything? A. Filmore made about one step towards me with his right hand in his pocket, and as it came above his pocket, with the stone in his left hand, the right hand with the revolver in it, I fired.

Q. How was he holding the pistol when you fired? (Witness indicates.)

Q. Where was it when you fired? A. The butt was just above the pocket.

Q. Did you see the pistol? A. Yes, sir. From the time he came up, I saw his hand was on his pocket, and I could see the bulk; it looked like the muzzle of the pistol. (Witness indicates to the jury how the pistol was held.) I could see the butt above the edge of the pocket.

Q. When you saw the pistol in that position, what did you do? A. I shot.

STATE *v.* ROWE.

Q. Did you move from the point where you were standing when you struck Avery with the gun, as you have described? A. After I got hold of the gun and smashed him, I didn't move; stood right where I was; it was all in a minute.

Q. Why did you shoot? A. Our life is dear to us, and I saw that, if I didn't shoot, I would be killed.

Q. When you shot, what did Filmore Rose do? A. Just as I threw the gun up he scringed a little; he was square facing me, and when I threw the gun up he scringed around to the right, turning his left shoulder a little towards me. The instant I fired he began to sink down. He sank down and at that moment I spoke to my brother and said, "Let's go."

Q. How did you go? A. Back towards home.

Q. Did you run or walk? A. We trotted; didn't run fast; went faster than a walk. Of course, when I fired the gun I thought Avery would go to his father, and I expected when Avery got to his father, he would grab the pistol; that was why we hurried away.

The witness further testified that when he reached his home, he changed his clothing and reloaded the gun and went with it to Spruce Pine and surrendered himself to an officer. He took the gun with him because he thought he would be assaulted. There was evidence tending to show that the prisoner and the deceased were very unfriendly at the time of the homicide, and had been for some time before. He had spoken before to the deceased about driving on his land, and the deceased became angry and quarreled with him, though he did not quarrel himself, but spoke mildly to him. The defendant, in this connection, testified: "I had been cursed by him and told him to never speak to me any more, and he had given me orders never to speak to him any more."

Q. What made him mad with you (that morning)? A. My speaking to him, I suppose.

Q. Didn't you know by your experience before that time that if you spoke to him it would make him mad? A. He seemed to be very passionate.

Q. Did he get mad when you would tell him to keep off the road and clover? A. Yes, he got mad before.

Q. You expected him to get mad that morning? A. I did not know whether he would get mad. I don't know what you are going to do. I spoke as kind to him as I am talking to you. I knew he had gotten mad at other times.

He further stated that he bore no malice towards the deceased at the time of the shooting; that he had learned not to entertain malice; that the clover and grass were not worth much—not over ten cents; that deceased weighed about 140 pounds and the boy, Avery Rose, about 125 pounds, and that he and his brother, Wesley, each weighed about 165 pounds. There was evidence that the prisoner and his brother, Wesley, did not start from home together. They met at the river, a half mile from the place of the homicide, prisoner with the axe and Wesley with the gun, which he carried for his brother to shoot squirrels with, as he did not hunt.

During the trial, after four of the counsel had closed their addresses to the jury, and just after one of the defendant's counsel had spoken, the judge said to the sheriff: "You can give the jury water, and, gentlemen of the jury, if you wish to retire to your room (the jury-room being a private room at the right of the jury box), you can do so for a few minutes. We have no band to play between the speeches." Defendant excepted.

The defendant requested the court to charge the jury that the language used by him, when talking to the deceased about keeping off the clover, was not calculated to provoke a difficulty or bring on a fight, if the words were spoken in a pleasant way and in a mild tone of voice. This the court refused to do, and defendant excepted. The defendant requested the court to give several instructions to the jury, and among others the following, which is typical of all of them, and presents the question of self-defense to the jury as fully as any of them: "The court charges you that from all the evidence, both for the State and the defendant, the defendants were in their field where they had a right to be, and being in a place where they had a right to be, if they were without fault in bringing on the difficulty and the deceased advanced upon them or either of them with a rock or pistol, with intent to slay the prisoners or either

of them, then the defendants were not required to retreat or
fly, but might stand their ground and repel the assault, even to
the extent of taking the life of the deceased; and if they did this,
your verdict should be 'not guilty.' You are to be the judges of
the reasonableness of the apprehension of the prisoners, or
either of them, at the time they were assaulted, if you shall find
from the evidence that they were assaulted; and to do this, you
are to place yourselves in the position and circumstances that
the prisoners were placed in at the time, and say whether or not
their apprehension was reasonable." The record states that
this instruction was given substantially. At all events, the
court charged the jury as follows:

"1. But when a person is without fault, and in a place where
he has a right to be, and a sudden, fierce, and continuous assault
is made upon him with a deadly weapon, he may stand his
ground and slay his adversary, if necessary, to protect himself
from death or great bodily harm. And the accused, under such
circumstances, is not required to wait until the opportunity for
successful defense is passed, but has the right to act in time to
prevent death or great bodily harm, and act on the facts and
circumstances as they appear to the prisoner, which facts and
circumstances are considered by the jury as sufficient to put
in fear of death or great bodily harm a person of reasonable
firmness and self-possession; and if under such circumstances
the prisoner, Charlie Rowe, shot the deceased, it would be ex-
cusable homicide.

"2. If you should find from the evidence that Charlie Rowe
was in a place where he had a right to be—and I charge you
that he was in a place where he had a right to be, being on his
own land—and you should find that he was reasonably without
fault in bringing on the difficulty, and that Filmore Rose made
a sudden, serious, and continuous assault upon them, then
Charlie Rowe would be allowed to stand his ground and shoot
the deceased to save his own life or himself from serious bodily
harm.

"3 Whether a person who is assaulted by another will be
justified in using such violence in resistance as will produce
death, must depend upon the nature of the assault and the

circumstances under which it was committed. It may be of such a character that the party assaulted may reasonably apprehend death or great bodily harm to his person, and in order to protect himself from such an assault he may kill his adversary. The law of self-defense is founded on necessity, and in order to justify or excuse the taking of human life upon this ground, it must appear, first, that the slayer had reason to believe that he was in danger of losing his life or of receiving great bodily harm; secondly, it must also appear to the jury that he believed as a reasonably firm man, that in order to avoid such danger it was necessary for him to take the life of the deceased. The danger of losing life or receiving great bodily harm must be real, or honestly believed to be so, at the time, and on reasonable ground, and the jury is the judge of such reasonableness of his fears. Though it may afterwards be ascertained that there was no actual danger, yet the slayer has a right to kill in self-defense if the danger is reasonably apparent. It should appear that the circumstances in which the slayer was placed were such as would have produced the fear of death or great bodily harm in the mind of a man of reasonable prudence, courage, and self-possession."

The court was also requested to charge the jury that there was no evidence of manslaughter. This was refused, and defendant excepted. Judgment was entered upon the verdict, and defendant appealed.

*Attorney-General Bickett, G. L. Jones, J. W. Pless, and John C. McBee for the State.*

*Hudgins & Watson, W. L. Lambert, C. E. Greene, M. L. Wilson, and Black & Ragland for defendant.*

WALKER, J., after stating the case. The remark of the judge to the jury is severely criticised by counsel as an intimation by him that the case was being argued by defendant's counsel at too great length; but we cannot draw the inference from it. Counsel for the State might just as well complain that it was directed against them. It seems to have been made indifferently. We are not informed by the record what elicited the remark, and we are unable to see that it was prejudicial to the

defendant. It may have been so, but it is incumbent upon him to show it. We will not presume error. *S. v. Tyson,* 133 N. C., 692; *S. v. Davis,* 134 N. C., 633; *S. v. Lance,* 149 N. C., 551; *S. v. Plyler,* 153 N. C., 630.

But it was strenuously contended and argued before us with much force and plausibility, that the words of the defendant, addressed to the deceased, were not calculated, nor could they have been intended, to provoke a difficulty, and, therefore, if the jury accepted the defendant's version of the facts, he was without fault, while the deceased made a sudden and deadly assault upon him, thus making complete the right of self-defense. Whether language is provocative or not, cannot always be determined by a mere consideration of the words by themselves. It is sometimes necessary, in order to ascertain the meaning or intention of the speaker, or the probable effect of what is said upon the person to whom he has spoken, that we should view them in their proper setting—the circumstances and surroundings of the parties, their previous relations to each other, and the state of their feelings. What is said by a friend may pass unnoticed, while if the same words are uttered by an enemy, they are like a spark, though small it be, falling into powder, and the explosion quickly follows. In such a case, a single word, though apparently innocent and harmless, will arouse the human passions of anger and resentment. An illustration may be found in *McGrew v. State,* 49 S. W. Rep., 226, in which it appeared that defendant and deceased, being unfriendly, had met casually in a saloon. Defendant ordered a glass of Dutch beer, whereupon deceased said: "I will take a glass of American beer," and a fight ensued. It was contended that the words of the deceased were not calculated to provoke a difficulty, but the Court ruled otherwise, and said: "While the act of provocation must be confined to the time when the homicide was committed, yet we do not understand by this that we cannot look back to facts transpiring before this, the course of conduct of the parties, and their former conversations, in order to shed light upon and render significant some act or declaration done at the time of the homicide." The evidence in the case shows that the deceased had previously quarreled with the defendant

about this same matter, and each had ordered the other not to speak to him. They were enemies, and the defendant should have known and did know of this state of feeling, at the time he spoke to the deceased about driving over his "clover patch." According to his own testimony, he accused the deceased of bad faith, in that he had deliberately broken his promise not to injure his grass and clover, and he should have known, if he did not know, that such language was calculated to provoke a difficulty, as deceased had quarreled with him before under like circumstances, and they would have fought then if the defendant, as he says, had not exercised great self-control. The court properly instructed the jury to consider the evidence and decide whether or not the words were calculated and intended to bring on a fight, and the exception to this part of the charge must be overruled.

The defendant was entitled to the instruction requested by him and which we have set out in the statement of the case, if he was entitled to any which he asked to be given; but while the judge did not use the language of the prayer, as he was not required to do so, we think the substance of the instruction was given in the general charge to the jury, and that was a sufficient response to the prayer. It may well be said that the charge of the court was favorable to the defendant, as much so as he had any right to expect, for the jury were told that the deceased was where he had a right to be, and that if a "sudden, fierce, and continuous assault was made upon him with a deadly weapon," the law permitted him "to stand his ground" and slay his adversary, and he was not required to wait until the opportunity for successful defense had passed, but might act at once upon the facts as they appeared to him; and if the jury found, when the evidence is thus considered, that is, by putting themselves in his place, that the circumstances were such as to put a man of ordinary firmness in fear of death or great bodily harm, the killing of the deceased was excusable, and they should acquit the defendant.

The following instruction was still more favorable: "If you find from the evidence that the defendant was in a place he had a right to be—and I charge you he was in a place where he had

a right to be, being on his own land—and you further find that
he was reasonably without fault in provoking the difficulty,
and that Filmore Rose made a sudden, serious, and continuous
assault upon him, then the defendant had the right to stand his
ground and shoot the deceased to save his own life or himself
from serious bodily harm." It will be observed that, in the
last instruction, the court did not describe the kind of assault
which would justify the taking of human life, with great
particularity. He did not tell the jury that it must have been
committed with intent to kill or even to inflict great bodily harm,
but that if it was "sudden, serious, and continuous," and without
regard to its effect upon the defendant's mind or whether cal-
culated to excite a reasonable apprehension of death or grievous
bodily injury, it would be sufficient to justify him in "stand-
ing his ground" and killing his adversary. The word "serious"
has no fixed or technical meaning in the law, but is rather gen-
eral and indeterminate in its signification. It may, when
applied to an assault, include one made with the intent to kill
or to inflict great bodily harm, or it may not, and the jury
should have been instructed more definitely upon the character
of assault that will justify a killing in self-defense; but this
omission was clearly in favor of the defendant, and he has no
just cause of complaint. The defendant certainly has no
ground upon which to base an exception that the case has not
been tried in accordance with the law as declared in former
decisions of this Court. *S. v. Dixon,* 75 N. C., 275; *S. v.
Blevins,* 138 N. C., 668; *S. v. Hough, ibid.,* 663.

The killing with a deadly weapon having been admitted, the
defendant was guilty, at least, of murder in the second degree,
nothing else appearing; and the burden accordingly rested upon
him to *satisfy* the jury that such facts and circumstances of
mitigation or justification existed as would excuse the homicide
or reduce its grade to manslaughter. *S. v. Brittain,* 89 N. C.,
481; *S. v. Barrett,* 132 N. C., 1005; *S. v. Capps,* 134 N. C.,
622; *S. v. Fowler,* 151 N. C., 731. There was some evidence
to show that the defendant slew Filmore Rose in self-defense,
and it was fairly submitted to the jury, under instructions
which were at least free from any error unfavorable to the de-

fendant. The jury decided the fact against him and accepted the theory of the State and the evidence in support of it, that there was no felonious assault upon the defendant prior to the homicide. This being so, he was guilty either of murder in the first or, at least, in the second degree, or of manslaughter. There was ample evidence upon which a conviction of either of the degrees of murder would have been warranted, but the jury, with merciful regard for the weakness and frailty of human nature, convicted of the inferior felony.

What was said in *S. v. Fowler,* 151 N. C., 731 (by *Justice Brown),* is peculiarly applicable to this case: "When, as in this case, the plea is self-defense, and the killing with a deadly weapon is established or admitted, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice. An unlawful killing is manslaughter, and when there is the added element of malice, it is murder in the second degree. When the defendant takes up the laboring oar he must rebut both presumptions—the presumption that the killing was unlawful and the presumption that it was done with malice. If he stops when he has rebutted the presumption of malice, the presumption that the killing was unlawful still stands, and, unless rebutted, the defendant is guilty of manslaughter. This is a fair deduction from the cases in this State. *S. v. Hagan,* 131 N. C., 802; *S. v. Brittain,* 89 N. C., 501, 502. At the request of defendant, the judge charged the jury very explicitly that if they should find from the evidence offered by the defendant that the killing occurred under circumstances claimed by him and testified to by his witnesses, they should return a verdict of not guilty. The jury discarded defendant's plea, and if, as now argued by him, there was nothing in the evidence to warrant a verdict of manslaughter, it was the duty of the jury to convict of murder in the second degree. It necessarily follows that, under such circumstances, the defendant cannot complain of a verdict for manslaughter, a lesser degree of homicide. An error on the side of mercy is not reversible." But, as also said in *S. v. Fowler,* we think there is, in this case, evidence upon which a verdict of manslaughter may well be supported, and it is not

necessary to apply the rule as broadly stated in *S. v. Quick,* 150 N. C., 820. The jury evidently concluded that the defendant had entered into the fight willingly, if not with malice or with deliberation and premeditation. There was evidence on the part of the State that the defendant pursued Filmore Rose and shot him, when there was no real or apparent necessity for doing so in order to defend his own person, and that after killing him he turned and snapped his gun twice at his son, a boy 16 years old. There was further evidence that Filmore Rose was not armed and that defendant must have known it, as the jury rejected his statement of the facts. He and his brother ran immediately after this tragedy, he says in fear of this boy, whom he thought would take the pistol from his father's pocket, when the jury find that there was none, and shoot him. There was evidence of other facts and circumstances strongly tending to show, not only the defendant's willingness, but his eagerness for the fray. His misfortune is that the jury did not credit his story, but repudiated it and the whole of it. He was fortunate, though, in the fact that the jury, having disbelieved him, did not convict him of murder.

We have not set out the charge of the court in its entirety. If we had done so, it would appear, more clearly than it does in the few passages taken therefrom, that the jury were clearly and fully instructed as to the law and its application to the facts and that the defendant was treated with perfect fairness and impartiality. We need not consider the other numerous exceptions, as they cannot be sustained in view of what we have already said, and we find no reversible error in the ruling to which they were taken.

No error.