### STATE v. PORTER CRISP.

(Filed 12 January, 1916.)

**1. Homicide—Self-defense—Assault Provoked—Quitting the Combat.**

One who has entered willingly into a fight in the sense of its being voluntary and without legal excuse, or who has wrongfully used language calculated or intended to provoke the difficulty which presently ensued, may not maintain the position of perfect self-defense for the killing of another, unless at a time prior to the killing he had quitted the combat within the meaning of the law.  *S. v. Kennedy,* 169 N. C., 334, cited and applied.

**2. Homicide—Assault Provoked—Abusive Language—Test.**

A test of the right of perfect self-defense is whether, if the homicide had not occurred, the defendant would be guilty of a misdemeanor involving a breach of the peace by reason of the manner in which he has provoked or entered into the fight.  Such instances mentioned and discussed by HOKE, J.

50—170

**3. Homicide—Assault Provoked—Self-defense—Abusive Language—Fighting Willingly.**

Where the defendant on trial for a homicide has used language calculated to provoke a breach of the peace, and at the commencement of the difficulty with the deceased had made hostile and threatening demonstration with a weapon, which he had taken from his pocket and kept for convenient use during the ensuing dispute, and thereafter the deceased sprang to possess the weapon, which fired twice during the scuffle, the second shot inflicting the mortal wound, the plea of a perfect self-defense may not be sustained, it appearing that the prisoner entered the fight willingly and continued willingly therein.

**4. Homicide—Self-defense—Abusive Language—Assault Provoked—Trials—Questions for Jury.**

Where the plea of a perfect self-defense is interposed by a defendant on trial for a homicide, and it appears that he had used violent and insulting language to the deceased immediately preceding an assault upon him, the question as to whether the language used was calculated or intended to bring on the assault, under the surrounding circumstances, is generally one for the jury.

APPEAL by defendant from *Webb, J.,* at July Term, 1915, of SWAIN.

Indictment for murder. Before entering on the trial the solicitor announced that he would not ask for a verdict of murder in the first degree, and the issue was submitted on the question of murder in the second degree or manslaughter or excusable homicide.

There was evidence tending to show that, in September, 1913, at Hazel Creek in Swain County, the prisoner, deceased, and four others were engaged in a game of draw poker, the prisoner having his pistol in evidence, lying near him; that an altercation having arisen between prisoner and deceased, the prisoner applied insulting words to the deceased, picked up his pistol, made a hostile demonstration with it, and then laid it back, and immediately, according to State's testimony, and after some two or three minutes, according to prisoner's statement, the deceased made a grab at the prisoner or the pistol and in the struggle over it the prisoner shot the deceased and killed him.

Speaking more in detail, Weaver Hurst, a witness for the State, testified in part as follows: "That the defendant Crisp, Arnold, Dalton, John Postell, Harley Gregory, and the deceased were playing poker on Sunday, the day the deceased was killed; at the time the trouble arose Crisp was dealer and Buchanan opened the pot. Dalton passed, Postell stayed, and Harley Gregory passed, and Crisp raised 50 cents. Buchanan looked over and asked Postell if he was going to call Crisp. He says, 'If you do not, I will.' Crisp said, 'You passed, didn't you?' talking to Buchanan. Buchanan said, 'I will leave it to the boys.' Crisp at this time had his pistol in his hand and laid it on the ground. Buchanan sat and looked Crisp right in the face; about that time he sprang at him, or the pistol. When he did that they went together. They came up about half-straight and the pistol fired. When the gun

fired witness ran off. When Crisp and the deceased had scuffled down the hill about 15 or 20 feet the witness went away and did not see any more. This occurred about 4 o'clock Sunday afternoon. The parties had been playing cards for four or five hours. The pistol had been lying on the ground by the side of Crisp and was Crisp's pistol. When Crisp said to Buchanan, 'You passed,' it was then he picked up the pistol. He put the pistol up next to Buchanan's face and said, 'Damn you, you passed,' and later laid the pistol down. It was at this time Buchanan looked at Crisp and sprang at the pistol. There were two shots fired in all. The first shot went into the ground and the second one was the one which killed Buchanan. Buchanan was kinder over Crisp when the first shot was fired. Buchanan after he was shot lived eight or ten minutes. The next time witness saw him he was dead. Witness, when the trouble began, left and went into the camp. The deceased was shot about 1 inch under the heart, on the left side. Buchanan did not have a pistol that day. Witness could not tell that Buchanan had been drinking any, but defendant seemed to be drinking."

Harley Gregory, another witness for the State, testified in part as follows: "We were sitting there playing poker, and Porter Crisp was dealing the cards. He dealt the cards and Tom Buchanan broke the pot for 10 cents. It passed on around to some of the other boys and back to Crisp, and he said, 'It will take 50 cents to see mine.' Buchanan looked over at one of the other boys and said, 'What are you going to do? If you don't call him, I will,' and he, Buchanan, threw his cards in and also threw in 40 cents. When he did this Crisp presented his gun at him and said, 'God damn you, you passed, didn't you?" and Buchanan said, 'I will leave it to the boys.' Crisp reached down and threw him his money and said, 'You passed. Take it like a little man and not like a little dog.' Buchanan looked at him and then made a grab for the gun. When he did that they raised about straight and the first shot was fired and they scuffled some few steps down the hill, then the second shot fired, and he called for some of the boys to come and help him, and they came back and he went in. Postell came in on the other side and took the gun out of their hands. I could not see whose hands he took it out of. Buchanan fell back in my arms and I laid him down on the ground. I was right behind Buchanan with my arms around him. The boys were bent over and I could not see who had the gun. I suppose the gun had been there ever since the game started. Crisp brought it, and I do not remember whether he laid it on the ground at the start, but it was lying there when the trouble occurred. After he made these statements and presented the gun in the direction of Buchanan he dropped the gun down across his thigh in the direction where Buchanan was sitting. I could not tell that Buchanan was drinking any, but Crisp seemed to be drinking some." The witness

further said, in part: "He heard Tom Buchanan say, 'Don't let him kill me,' and heard Crisp say, 'Damn you, I don't want to kill you, but if you don't turn me loose, I will.'"

Harvey Gregory, in his examination in chief, testified in part: "That he was sitting off about fifteen steps when he first knew of it. Porter Crisp had presented his gun in the direction of Buchanan and said, 'Damn you, you passed.' Buchanan said, 'I will leave it to the boys.' Witness further testified that he could not see what they did with the gun. He was below. The next he knew he saw Buchanan make a spring down the hill. I suppose he grabbed at the gun in his arms or something, and they got about half-straight and the first shot fired. They backed off about eight steps and the second shot fired. I ran about fifty yards. Harley was up above, and he called for some of us boys to come and help him, and we went back. About the time we got back Postell and Harley went in. Postell got the gun and Buchanan fell back in Harley's arms and he laid him on the ground. Postell ran off. Crisp ran away."

The prisoner, testifying in his own behalf, said that he took the pistol with him, not for any purpose, but just like "a boy will," and the weapon incommoding him, he took it out of his pocket and laid it on the ground beside him; that at the precise time of the occurrence Buchanan had thrown down his hand, which indicated that he no longer had a right to participate in that bet, and then, when he undertook to do so, witness told him that he had no right to do so, whereupon deceased called witness a liar. Witness told him not to do that, he was telling the truth, and at the same time picked up the pistol and put it across his knees; that Buchanan was a larger man and looked right wild, was the reason witness picked up his pistol; that witness threw Buchanan his money, laid down the pistol, and thought the matter was settled, and picked up the cards and started to shuffle, and, three or four minutes later, probably longer, Buchanan "jumped at witness and grabbed," and both got the gun about the same time; that witness was not trying to shoot deceased, but to get the gun away from him, and in the scuffle it went off and killed him; that at no time during the struggle did witness try to shoot deceased, and didn't intend to do so. Witness told deceased several times to turn the gun loose, that he did not wish to shoot him, etc.

The court, in an elaborate and comprehensive charge, referred to the entire testimony, stating the positions of the State and the prisoner, instructed them as to the law, distinguishing manslaughter from murder, as applied to this evidence, and, among other things, directed the jury, as shown in the excerpts from the charge as indicated in the prisoner's exceptions and assignments of error, as follows:

"Gentlemen of the jury, the law says that a man cannot bring on a difficulty and then invoke the doctrine of self-defense. The law does not

permit a man to do that. The law says if a man enters a fight willingly, if he is willing to fight before the fight begins, and if he takes the life of another, the law says he is guilty of murder in the second degree or manslaughter, as the jury may find from the evidence and the law as given them by the court. . . .

"The court charges you, if you find beyond a reasonable doubt that the defendant entered into the fight willingly before the fight began, and after getting into it, and at the time he went into it, that it was his purpose to kill the deceased; if he had made up his mind to kill the deceased, though he had not premeditated it—if you find those facts, it would be your duty to find the defendant guilty of murder in the second degree. . . .

"And if you find beyond a reasonable doubt that he entered into the fight willingly, that he was willing to enter into a combat, that is, before the combat began, and find that after he entered it he shot and killed the deceased, but that it was not his purpose to do so, he had not made up his mind to do so, but find that he did shoot and kill him, that would be manslaughter, and it would be your duty to convict him of manslaughter. . . .

"Or if you find beyond a reasonable doubt that the defendant entered the fight willingly, that he was willing to fight the deceased, and entered into it willingly just as the fight began or before the fight began, and find that he did not intend to kill the deceased, it was not his purpose to kill him, had not made up his mind to kill him, but if you find that he entered into the fight willingly, and they got into an altercation and used that pistol, one trying to get it from the other and the other trying to get it, and he was willing to fight on his part, and it went off while so fighting and killed the deceased, the court charges you that the defendant would be guilty of manslaughter, and it would be your duty to so find. . . .

"Or if the State has satisfied you beyond a reasonable doubt that the defendant used language, just before the fight began, towards the deceased that was calculated and intended to bring on the difficulty, and if you find that after the language was used, if you find beyond a reasonable doubt that the defendant did use language calculated and intended to bring on the difficulty, and if you find that after that language was used, if you find beyond a reasonable doubt that the defendant did use language calculated to bring on the fight, and the fight ensued, and if you find that they got into this altercation, and, trying to get the pistol, the defendant shot and killed the deceased, the court charges you that it would be manslaughter, and it would be your duty so to find. Or if you find that the defendant used language calculated and intended to bring on the fight, and they got into this altercation, and you find that they were struggling over the pistol and the pistol fired in the hands of

either one of them and killed the deceased, the court charges you that the defendant would be guilty of manslaughter, and it would be your duty so to find. . . .

"So, gentlemen, it is important for you to find as to what occurred. Did this defendant curse the deceased? Did he use the language that one of the witnesses testified to, 'Take it like a man and not like a little dog'; and did he say 'You passed, God damn you'? Has the State satisfied you beyond a reasonable doubt that the defendant used that language towards the deceased? And has the State satisfied you that that language was calculated and intended to bring on a fight? If the State has so satisfied you beyond a reasonable doubt that he used that language towards the defendant, and that such language was calculated and intended to bring on the fight, the court charges you that this defendant is guilty of murder in the second degree, or manslaughter, as you may find under the instruction of the court."

To this portion of his Honor's charge defendant excepted.

The jury convicted prisoner of manslaughter, and from judgment on the verdict prisoner appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Bryson & Black and J. N. Moody for defendant.*

HOKE, J., after stating the case: It is insisted chiefly for the prisoner that his Honor's charge, in effect, denied him the right to a perfect self-defense, if the jury should find that he entered into the fight willingly or used language calculated and intended to provoke the difficulty which presently ensued, the objection being that, under our authorities, his Honor should have added "unlawfully" to this feature of his charge. While this may be correct as a general proposition, we are of opinion that it does not arise to defendant on this record.

It is the established position with us that a defendant, prosecuted for homicide in a difficulty which he has himself wrongfully provoked, may not maintain the position of perfect self-defense unless, at a time prior to the killing, he had quitted the combat within the meaning of the law as declared and approved in the recent case of *S. v. Kennedy,* 169 N. C., p. 326, and other like cases. In some of the decisions on the subject it has been stated as a very satisfactory test that this right of perfect self-defense will be denied in cases where, if a homicide had not occurred, a defendant would be guilty of a misdemeanor involving a breach of the peace by reason of the manner in which he had provoked or entered into a fight. Under our decisions such a position would exist:

*a.* Whenever one has wrongfully assaulted another or committed a battery upon him.

*b.* When one has provoked a present difficulty by language or conduct towards another that is calculated and intended to bring it about. *S. v. Shields,* 110 N. C., 497; *S. v. Fanning,* 94 N. C., 940; *S. v. Perry,* 50 N. C., 9. And, in this connection, it is properly held that language may have varying significance from difference of time and circumstances, and the question is very generally for the determination of the jury. *S. v. Rowe,* 155 N. C., 436.

*c.* Where one had wrongfully committed an affray, an unlawful and mutual fighting together in a public place, the more recent ruling being to the effect that the "public place," formerly considered an essential, need be no longer specified or proved. *S. v. Griffin,* 125 N. C., 692.

And when there is relevant testimony, it has come to be considered the correct and sufficient definition of an unlawful affray or breach of the peace when one has "entered into a fight willingly" in the sense of voluntarily and without lawful excuse. *S. v. Harrell,* 107 N. C., 944.

Extending and applying these principles to prosecutions for homicide, it has been repeatedly held in this State that where this element of guilt is present, and one has slain another under the circumstances indicated, the offender may not successfully maintain the position of perfect self-defense unless he is able to show, as stated, that at a time prior to the killing he quitted the combat and signified such fact to his adversary.

In the present case his Honor, in effect, charged the jury that if testimony of defendant was believed, they would acquit him. The jury, therefore, having received and acted on the State's evidence as presenting the true version of the occurrence, and, in the light of this testimony and the principles of law heretofore stated, his Honor was clearly justified in charging the jury as he did that if the defendant entered into the fight willingly or used language calculated and intended to bring it on, he could not maintain perfect self-defense unless he satisfied the jury that he had quitted the combat, etc., the State's evidence tending to show that the defendant, with his pistol continuously in evidence, had used language towards deceased that, under the circumstances, was well calculated to provoke a breach of the peace, and further, that at the commencement of the difficulty he had made a hostile and threatening demonstration with the weapon.

There are decisions on the subject in other States and by courts of high repute that are not in full agreement with the position as it obtains with us, some of them being to the effect, as we interpret them, that mere language, however insulting, may never be held to deprive a man of his right of self-defense. In some of these cases, however, as pointed out in *S. v. Kennedy, supra,* the defendant had been convicted of the capital offense of murder, and the Court, in discussing whether such a conviction should be upheld, were not called on to be particularly advertent to the distinction between perfect self-defense, where a defendant is excused

altogether, and imperfect, where the capital offense may be reduced to a lesser degree of the crime. In others the language ordinarily regarded as insulting was used in jest or under circumstances where it could not properly be said to have provoked the difficulty within the meaning of the law. But those cases which hold, as some of them seem to hold, that language, however insulting, may not under any circumstances deprive a man of his right of perfect self-defense in a fight which his own wrongful words have provoked, do not, in our opinion, afford a safe or sound rule by which to weigh and adjust the significance of human conduct, and the position, as it obtains in this State, is grounded on the better reason and is well sustained by authority. *S. v. Kennedy, supra; S. v. Robertson,* 166 N. C., 356; *S. v. Yates,* 155 N. C., 450; *S. v. Turnage,* 138 N. C., 566; *S. v. Garland,* 138 N. C., 675; *S. v. Brittain,* 89 N. C., 481; *S. v. Zorn,* 202 Mo., 12; *People v. Filippellé,* 173 N. Y., 509; *Reid v. State,* 11 Texas App., 509; *Adams v. The People,* 47 Ill., 376.

In *Yates' case, supra,* it was held: "It is the duty of one who is assaulted to abandon the difficulty and avoid the necessity of killing, if he can do so with reasonable safety; and one who enters into a fight willingly and does not abandon it, but prefers to stand his ground and continue in the fight, is guilty of manslaughter at least, if he kills."

In *Reed v. State, supra, White, C. J.,* delivering the opinion, states the correct doctrine as follows: "But the right of self-defense, though inalienable, is and should to some extent be subordinated to rules of law, regulating its proper exercise, and so the law has wisely provided. It may be divided into two general classes, to wit, perfect and imperfect right of self-defense. A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong—if he was himself violating or in the act of violating the law—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defense. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then, indeed, the law wisely imputes to him his own wrong, and its consequences to the extent that they may and should be considered in determining the grade of offense, which but for such acts would never have been occasioned."

And in *People v. Phillipellé, Cullen, J.,* after quoting with approval from *Reed v. State* and *Adams v. State,* concludes as follows: "Tersely stated, it is that, if one takes life, though in defense of his own life, in a quarrel which he himself has commenced with intent to take life or inflict serious bodily harm, the jeopardy in which he has been placed by the act of his adversary constitutes no defense whatever, but he is guilty of murder. But, if he commenced the quarrel with no intent to take life or inflict grievous bodily harm, then he is not acquitted of all responsibility for the affray which arose from his own act, but his offense is reduced from murder to manslaughter."

We were referred by counsel to *S. v. Baldwin,* 155 N. C., 494, and *S. v. Pollard,* 168 N. C., pp. 116-119, as authorities against the validity of the present conviction; but, on the facts in evidence as received by the jury, neither case supports the defendant's position. In *Baldwin's case,* on evidence tending to show that defendant was wrongfully assaulted by deceased with a display of deadly weapons, threatening serious bodily harm, the court charged the jury: "That if the prisoner fought willingly at any time up to the fatal moment, it would be the duty of the jury to convict of manslaughter." And a new trial was awarded because the charge, as expressed, ignored the evidence tending to show that the deceased was the aggressor and required a conviction if the prisoner at any time fought willingly, though it might have been "rightfully and in his necessary self-defense." And in *Pollard's case,* although an instruction which was disapproved contained the expression, "if defendant was willing to enter into a fight with deceased with a deadly weapon he would be guilty of manslaughter," this was on evidence in behalf of defendant tending to show that deceased was a violent and dangerous man; that he had made threats against the life of the defendant and, shortly thereafter, came to defendant's place of business, cursed him, and made a demonstration as if to draw his pistol, when defendant fired and killed him, and the Court held that the entire instruction had so confused the general definition of manslaughter with the right of self-defense, arising to defendant on the evidence, as to create the necessary impression on the jury that defendant would be guilty if he was willing to fight, though he might have done so rightfully and in his necessary self-defense, thus making the charge conflict with the principles of *Baldwin's case.* Neither decision is applicable to the facts as presented in this record, where, on the testimony as received by the jury, the defendant, under a correct charge, has been found to be the aggressor and to have wrongfully provoked the fight in which the deceased was slain.

There is no error, and the judgment on the verdict is affirmed.

No error.