STATE OF NORTH CAROLINA v. LOUIS AARON TAYLOR

No. 7226SC531

(Filed 2 August 1972)

**Homicide §§ 9, 28— self-defense — defendant's immoral conduct — time and place of killing**
> The trial court's instruction in a manslaughter case that to claim a right of self-defense, a defendant must be in a place where he had a right to be and a defendant living in a woman's apartment in adultery had no right to be there, was improper in that it informed the jury that defendant's right of self-defense was precluded solely by reason of his prior improper association with the wife of the deceased, and it eliminated the possibility that the episode between deceased and his wife which involved the actual shooting of deceased might not have been precipitated by the previous adulterous conduct of defendant and deceased's wife.

APPEAL by defendant from *McLean, Judge,* 17 April 1972 "C" Session of Superior Court held in MECKLENBURG County.

The defendant was placed on trial pursuant to a bill of indictment proper in form charging him with the crime of manslaughter. The defendant entered a plea of not guilty. The jury returned a verdict of guilty as charged in the bill of indictment, and from a prison sentence of fifteen years the defendant appealed.

The record agreed to by the solicitor on behalf of the State and by the attorney for the defendant states the following factual situation:

> " . . . The evidence in the light most favorable to the State indicated that the defendant was dating the estranged wife of the deceased on the 18th of December 1971. The deceased had on several occasions prior to this date threatened the defendant and the defendant's separated wife with bodily harm and death. On the 18th of December at

approximately 1:30 a.m. the deceased gained entrance to the house where the defendant and his estranged wife were staying and commenced an assault upon the wife. As the decedent's assault upon his wife increased, she was chased from the house by the deceased into an open field some distance away from the home where he began to assault her once again, hitting her with a two by four or stick. The defendant followed the deceased and his estranged wife from the house and came upon this situation in the open field, whereupon he told the deceased to stop beating his wife. At this, the deceased turned on the defendent stating, 'you are going to die tonight' and advanced upon the defendant with the two by four in one hand and at the same time reaching in his pocket. The defendant backed up from the deceased and fired once in the air, once in the ground, fired at the defendant, hitting him in the arm, all the time backing up. The deceased did, not stop and continued to advance upon the defendant admonishing that he was going to kill the defendant at that time. At this time the defendant fired the fatal shots and ran from the scene."

In addition to the factual situation set out above, the record discloses that the deceased, John Henry McNeely, and his wife, Pamela Elaine McNeely, were married sometime in February 1970. On 18 December 1971 Pamela and the deceased had been living separate and apart for about two and one-half months. Pamela was living in an apartment on Jones Street with her sister. Also in the apartment was the sister's boyfriend, Pamela's older brother and Pamela's two children. When Pamela separated from her husband, she got in touch with the defendant and invited him to move in with her, and the defendant did so. The defendant was the father of Pamela's youngest child. On several occasions prior to 18 December, the deceased had told the defendant to move out and leave Pamela alone. In fact, on one occasion the deceased had threatened the defendant with a pistol. The defendant, who was eighteen years of age, purchased a .22 pistol which he carried in his pocket at all times. About 9:00 p.m. on December 18 the deceased and a male companion came to the apartment. The deceased and Pamela got into an argument, and the deceased struck Pamela with his fist. The deceased remained in the apartment fussing and fighting with Pamela until about 11:30 p.m. when

the deceased and his companion left. About 1:30 a.m. the deceased and his companion returned to the apartment, and the deceased renewed the fighting with Pamela. Pamela finally ran out of the room and down the stairs and out of the house. In the field where the deceased again caught Pamela he was apparently beating her with a stick or a two by four when the defendant came to her aid. The deceased was shot three times by the defendant. The defendant testified as to the fatal shooting and the events just prior thereto as follows:

" . . . After John chased Pam out of the house, I ran out behind them and when I got outside I could not see them. I first went up to the store because the telephone was up there, but I did not see Pam and John. The store is about 200 yards from Jones and Grant Street. I didn't hear anything up there and I was coming back down to the apartment and I heard Pam hollering and screaming from in the field over there on Grant Street. I ran to the field and when I got in the field I saw John was standing over Pam beating her with a two by four. She was lying down on the ground and I got to within about 15 feet of them.

When I got to that point, I hollered at John and told him to let her up, that she didn't want to go back to him. I did not have my pistol in my hand at that time, it was in my pocket. I hollered at him to let her up, he told me he was going to kill me and stuck his hand in his pocket and started toward me. I started backing up. I got scared and that's when I pulled the pistol out. I shot once up in the air and told him I didn't want to kill him and I shot another one in the ground, but he did not stop. He kept coming on me and said that he was going to kill me. After I shot in the air and shot in the ground, I kept backing up and he kept coming. I shot again. This time I aimed and shot at his arm. I don't think I hit him when I shot at his arm. I don't know whether I hit him or not. When I did that he still didn't stop and then I shot another shot at him. I fired five shots all together and during the time that I was shooting, I was still backing up. I didn't just turn my back and try to run because he had a two by four in his hand and he was going in his pocket attempting to get something and I was scared of him.

After I fired the fifth shot he was still coming and at that time I ran. . . . "

*Attorney General Robert Morgan by Assistant Attorneys General William W. Melvin and William B. Ray for the State.*

*Waggoner, Hasty and Kratt by John H. Hasty for defendant appellant.*

CAMPBELL, Judge.

The defendant assigns as error the instruction of the trial judge to the jury pertaining to the right of self-defense asserted by the defendant.

The trial judge instructed the jury that "[s]elf defense may be divided into two general classes, namely, the perfect and imperfect right of self defense." The Court then went on to describe the difference between a perfect and an imperfect right of self-defense in accordance with the doctrines set out in *State v. Crisp*, 170 N.C. 785, 87 S.E. 511 (1915) and then added:

> "Now, the Court instructs you, members of the jury, that a person in order to claim a perfect right of self defense must be at a place where he has a right to be. The Court instructs you that if you should find from this evidence beyond a reasonable doubt that the defendant was there in Apartment 3 at 305 Jones St., living in adultery with the deceased man's wife, that he had no right to be there. The law of this land provides that two people unmarried who move into an apartment and live together are living in the state of adultery in violation of the law and the defendant would have had no right to have been there living in a state of adultery with this wife of the deceased McNeely and if he was there violating the law and under those circumstances he brought about a condition of things which produced the condition in which he found himseslf, the fighting of McNeely and his wife, and even though he was fighting in his own proper self defense, he could not complain of a perfect self defense and if under those circumstances he shot and killed the deceased McNeely, not in his own perfect right of self defense but due to circumstances which he had created himself by living there in adultery with the wife of McNeely, he would be guilty of at least manslaughter."

After the jury had deliberated for some time, the jury returned to the courtroom and requested the trial judge to redefine that portion of the charge on perfect self-defense and imperfect self-defense. Pursuant to this request, the Court again instructed the jury on the two general classes of self-defense, namely, the perfect and imperfect right of self-defense. After so instructing the jury again, the Court concluded with these words:

"So, the Court instructs you, members of the jury, that in order for the defendant to avail himself of the right of self defense, he must not have done or committed any act which would have brought on the difficulty and he must be in a place which he had a right to be at the time.

Now, the Court instructs you if you find from this evidence beyond a reasonable ground that this defendant was living there in a state of adultery with the wife of the deceased man and that as a result of him living there with the deceased man's wife the situation arose out of which the killing occurred, then the Court instructs you that he could not plead a perfect self defense and if you find those facts beyond a reasonable doubt, that he was living there in a state of adultery where he had no right to be, and under such circumstances as the deceased man came there seeking his wife and as a result of which they got into an argument and under such circumstances the defendant killed the deceased, by bringing about the circumstances himself or contributing to those circumstances, jointly with the wife of the deceased man, then the Court instructs you that he could not plead a perfect self defense and that under those circumstances if he by his own conduct brought about the circumstances under which he killed the deceased, even though he was fighting in his own self defense, he would be guilty of manslaughter."

The defendant assigns as error those two portions of the charge set forth above.

We think this exception well taken.

In the case of *State v. Jennings,* 276 N.C. 157, 171 S.E. 2d 447 (1969), the Court, after quoting from *State v. Crisp, supra,* stated:

"Likewise, it is our opinion that conduct towards another must be evaluated within the framework of the surroundings, circumstances and parties, including their previous relations and the then existing state of their feelings. However, the fact that a person has previously been guilty of immoral conduct or wrongful acts, or has had past difficulties with the decedent, does not, standing alone, deprive a defendant of his right of self-defense. 40 C.J.S., Homicide, § 119, at 990. The requirement that a defendant must be free from fault in bringing on the difficulty before he can have the benefit of the doctrine of self-defense ordinarily means that he himself must not have precipitated the fight by assaulting the decedent or by inciting in him the reaction which caused the homicide. Usually, whether the defendant is free from blame or fault will be determined by his conduct at the time and place of the killing. Yet the fault in bringing on a difficulty which will deprive him of the right of self-defense is not confined to the *precise* time of the fatal encounter, but may include fault so closely connected with the difficulty in time and circumstances as to be fairly regarded as operating to bring it on. 40 Am. Jur. 2d, Homicide, § 145, at 434.

Here, defendant had been engaged for a period of years in conduct with deceased's wife which, in the eyes of an average juror, would fix him with blame and fault, and under the particular facts of this case the court should have amplified and explained the meaning of 'without fault' and 'free from blame.' . . . "

In the instant case the mandate of the trial judge to the jury was to the effect that if the defendant was living in adultery with the estranged wife of the deceased, then he had forfeited his right of self-defense and precluded the jury from considering all of the facts and circumstances and particularly the fact that the espisode which occurred in the field when the actual shooting took place might not have been precipitated by the previous adulterous conduct of the defendant and Pamela. The mandate in the instant case was too strongly slanted against the defendant.

In the brief for the State, it is contended that the case at bar is distinguishable from the facts in *State v. Jennings, supra,* because in the *Jennings* case the deceased had known of the illicit relations for some time and had spoken to the defendant

Mayo v. Casualty Co.

about the same; whereas, in the case at bar, there is no evidence that the deceased knew of the illicit relationship. We do not find this distinguishing characteristic in the instant case. Just as in *Jennings,* in the instant case the deceased knew of the illicit relations between his wife Pamela and the defendant. In fact, the deceased had previously threatened the defendant and had ordered the defendant to remove himself from the apartment where Pamela was living. On the very night of the homicide, the deceased reminded the defendant that he had previously ordered him to leave and that the defendant had not done so. We find the present case controlled by the. rules laid down in *Jennings.* For a subsequent trial of *Jennings* see *State v. Jennings,* 279 N.C. 604, 184 S.E. 2d 254 (1971).

New trial.

Chief Judge MALLARD and Judge BRITT concur.