Gaston, Judge.
 

 We are of opinion that the Judge did not err, in refusing to give the first instruction which was prayed for by the counsel for the prisoner. It is not questioned but that the prisoner was entitled to the benefit of all those humane principles of the common law, which, in in-
 
 *82
 
 diligence to the frailties of human nature, extenuate the guilt h°m'ciRe from murder to manslaughter. The great distinction between homicide committed with malice, and homjc;c|e committed in a transport of passion, suddenly excited by a grievous provocation, is as steadily to be kept in view, in the trial of a slave charged with the murder of a while man, as in that of a while man charged with the murder of his equal, or of a slave. But, it cannot be conceded that the same matters which would be deemed in law a
 
 sufficient provocation
 
 to free a white man, who had committed a homicide, in a moment of passion, from the guilt of murder, will have the same effect, when the party slain is a while man, and the offender a slave. It has been authoritatively held, that the killing of a slave by a white man may be reduced from murder to manslaughter, by acts, which,
 
 proceeding
 
 from a white man, would not in law constitute a sufficient provocation. Among equals, the general rule is, that words are not, but blows are, a sufficient provocation; while in Tackett’s case, it was declared that there
 
 might be
 
 words of reproach, so aggravating when uttered by a slave, as to excite the temporary fury which negatives the charge of malice.
 
 Tackett’s case,
 
 1 Hawks 217, 218. This difference in the application of the same principle, arises from the
 
 vast
 
 difference which exists, under our institutions, between the social condition of the white man and of the slave; in consequence of which difference, what might be felt by one as
 
 the
 
 grossest degradation, is considered by the other as but a slight injury. And from the same cause, it must necessarily follow, that some acts, which between white persons are grievous provocations, when proceeding from a white person to a slave — whose passions are, or ought to be tamed down to his lowly condition — will not, and cannot be so regarded. The degrees of homicide are indeed to be ascertained by common law principles; but the principles themselves are necessarily, in their application, accommodated to the actual conditions of human beings in our society.
 

 Nor do we apprehend that there was error in refusing to give the second instruction which was prayed for. It is the difference of condition between the white man and the slave
 
 *83
 
 —as recognized by our legal institutions — and not the difference between personal merit and demerit — which creates a legal distinction between the sufficiency and insufficiency of the alleged provocation.
 
 This
 
 distinction, therefore, must be as broad as
 
 that
 
 difference — or it would not only be unsuited to the state of our society, and incompatible with the subordination of ranks essential to the safety of the State— but would be too vague to be admissible as a legal rule. It may be, that the while man who debases himself by a familiar association with a slave, and, in the course of that assocition, is guilty of acts of meanness like that attributed— whether justly or unjustly — to the unfortunate deceased— has not claims to personal respect equal to those of the slave; but the distinction of castes yet remains, and with it remain all the passions, infirmities, and habits, which grow out of this distinction.
 

 With respect to the fourth instruction prayed for by the-prisoner’s counsel, we hold that the Judge did err in refusing it, and instead thereof directing the jury, as we understand him to have directed, that the deceased had a right, because of the prisoner’s insolence, to attack the latter with the knife and fence rail. In the case of the
 
 State
 
 v. Hale,
 
 2
 
 Hawks, 582, it was decided that the battery of a slave, by any other than his master, was
 
 per se
 
 a public offence; but, at the same time it was declared, that such a battery might be justified, if not excessive, by circumstances which would form no justification for the battery of a white mail. It was not attempted to
 
 define
 
 those circumstances — nay, it was pronounced
 
 impossible
 
 to do so with precision. The nearest approach to a definition was, that the circumstances must be of such a character as warranted the apparent breach of the public peace, “ under the habits and feelings of society, securing at “ the same timej the white man from injury and insult, and t! the slave from needless violence and outrage.” Where we can find a rule established, it is our duty to adhere steadily to it. Wherever our predecessors have declared it impossible to draw the line, we dare not attempt it.
 

 We feel ourselves, therefore, bound to say, that insolence of a slave does not justify an excessive battery; and we can
 
 *84
 
 not hesitate to hold, that an assault with a sharp pointed knife, three inches long, and a piece of fence rail of, the length of one’s'arm, is an attempt to commit an excessive battery— ]-,ecause these are not lawful instruments wherewith to check or to correct insolence. The language of his Honor indeed, is, “ that if the prisoner used the provoking language testified by the witnesses, the deceased had a right to
 
 whip
 
 him;” but, by the phrase “ whip,” he must necessarily be understood as meaning to whip in the manner testified by the witnesses. But, if the language used were intended to convey only the idea of moderate chastisement, by an ordinary instrument of correction, the correctness of
 
 that
 
 instruction would depend materially upon the fact whether the insolence had been discontinued, or was going on at the
 
 moment of
 
 correction. Upon this point, the testimony seems to have been contradictory, or, at all events, was not free from doubt. One witness represented the reproachful language of the prisoner as continuing uninterrupted up to the moment of the conflict. — ■ while the others stated that it entirely ceased upon the finding of the piece of money. How the fact was, it was the peculiar province of the jury to determine; and, in determining that fact,fit might be very material to ascertain what was the motive of the prisoner’s return, after he had been chased off by the deceased, and what the manner of his behaviour, when he,so returned. If the insolence had been
 
 clearly
 
 discontinued, then the attack of the deceased upon the prisoner was for vengeance on account of past insolence, and not in order to stop continuing abuse. And, on this point, we are instructed by our predecessors that it is not necessary, in any case, that a person who
 
 has received
 
 an injury, real or imaginary, from a slave, should carve out his own justice; for the law has made ample and summary provision for the punishment of all trivial offences committed by slaves, by carrying them before a Justice, who is authorised to pass sentence for their being publicly whipped. This provision, while it excludes the necessity of private vengeance, would seem to forbid its legality, since it effectually protects all persons from the insolence of slaves, even'where their masters are unwilling to correct them upon complaint'being made.
 
 State
 
 v.
 
 Hale.
 
 2 Hawks, 585.
 

 
 *85
 
 If we could reconcile such a course to a sense of duty, we should forbear from examining the case any further. The prisoner was entitled to have the law applicable to his case correctly expounded to the jury. This, in our judgment, was not done; and, as the verdict may have been affected by that error, it is proper that he should have another trial. But, it is impossible not to see, that upon that trial, the other questions which have been here argued must occur; and, therefore, so far as we have formed a decided judgment upon them, we cannot rightfully decline from now declaring it.
 

 One of these is connected with the third instruction prayed for by the prisoner’s counsel. If it be the meaning of that instruction that the case of the prisoner falls within the rule which obtains where parties become suddenly heated, and engage immediately in mortal conflict, fighting upon equal terms, and one killeth the other; we are obliged to say that the case of the prisoner is not within that rule. In mitigating the offence to manslaughter, Where death ensues upon a sudden rencounter of this sort, the law shews its indulgence to that frailty of human nature which urges men, before they have an opportunity for reflection, to a compliance with those common notions of honour which forbid either to give way to, or acknowledge the superior prowess of, the other. Such notions spring from a sense of equality, and the horror of personal disgrace. They do not prevail — they ought not to exist — between those who cannot
 
 combat
 
 with each other, without degradation on the one hand, and arrogance on the other. If that instruction is predicated upon the ground that the first assault, having been made by the deceased, constituted a
 
 provocation
 
 for the homicide committed by the latter, it then presents enquiries by no means free from embarrassment.
 

 As yet a precise rule has not been laid down by which to pronounce what unlawful 'interference with the person of a slave by a white man, shall be deemed a provocation sufficient to excite that transport of passion, which, although a deadly weapon is used, may extenuate the killing of the assailant into manslaughter. And by whomsoever the attempt to prescribe such a rule shall be made, he will find it no ea
 
 *86
 
 sy task to form a rule which shall consist with the principles Public policy on the one hand, and with the just claims of humanity on the other. The superior rank of the assail- ^ ant. — the habits of humility and obedience which belong to the condition of the slave — habits which are not less indispensable to his own well-being than required by the inveterate usages of our people — clearly forbid that an ordinary assault or battery should be deemed, as it is between white men, a legal provocation. The law'- will not permit the slave to resist. It is his duty to submit. — or flee. — or seek the protection of his master; but is impossible, if it were desirable, to extinguish in him the instinct of self-preservation; and although his passions ought to be tamed down so as to suit his condition, the law would be savage, if it made no allowance for passion. He may have been disciplined into perfect obedience to the will, of his master, and, therefore, habitually patient under
 
 his
 
 correction; but he cannot but feel a keen sense of wrong when authority is wantonly usurped over him by a stranger, and exercised with cruelty. There is therefore no difficulty in laying it down that a battery which endangers his life or great bodily harm — .proceeding from one who has no authority over him — will amount to such a provocation. But between these extremes there are intermediate injuries of various grades. In regard to them, we are obliged to resort to the primary rule which pronounces on the character of provocations, and apply it according to the circumstances of each case. That is a legal provocation of which it can be pronounced, having due regard to the relative condition of the white man and the slave, and the obligation of the latter to conform his instinct and his passions to his condition of inferiority, that it urnald provoke well disposed slaves into a violent passion. And the application of the principle must be left, until a moro precise rule can be formed, to the intelligence and conscience of the triers.
 

 Two other points have been presented to our consideration, in the course of the argument, upon which it is proper to express our views. It has been correctly stated by the Attorney General, that although there should be a legal provocation, yet the homicide will be murder, if committed under
 
 *87
 
 such circumstances of cruelty as manifest the thoroughly wicked heart — and he has insisted that such circumstances of cruelty are manifested in the case before us. Cruelty, when
 
 the facts
 
 from which it is
 
 to
 
 be inferred all distinctly appear, is an inference of law; and, therefore, properly drawn by the court. But in this case, the facts are not so set forth as to leave the question of cruelty one for legal inference.— No more is stated, than that several blows were struck with .a stick of curled hickory of the ordinary size, and with the larger end thereof,'without informing us more of the nature of those blows, than that onfe of them was mortal. On the part of the prisoner, it has been insisted, and properly insisted, that if the weapon used was not of the character called deadly, that is, likely to produce death or great bodily injury, the homicide would not be murder, although committed without legal provocation; and it has been argued, that in this case the weapon was not of that character. No doubt there are many cases, in which the court can distinctly see, from the nature of the instrument used, whether it be of a deadly character or not; and, therefore, need not that the jury should directly find the fact for their information. But this is not á case of that kind. It is one in which it falls peculiarly within the province of the jury to ascertain, whether such a weapon, in such hands, and as it was used, was likely to produce fatal consequences or not.
 

 This opinion must be certified to the Superior Court of Person, with directions to award to the prisoner a venire
 
 de novo.
 

 Per Curiam. Judgment to be reversed.