The prisoner was indicted in Sampson County for the murder of Alfred Flowers, and, after plea of not guilty, on his motion and affidavit, the trial was removed to Cumberland. He was there tried and convicted, but, upon an appeal to this Court, the judgment was reversed, and a venire denovo awarded. 29 N.C. 299. At the next term of Cumberland Court, in November, 1847, the prisoner offered an affidavit on which he moved for another removal of the trial, and the court ordered it to be removed to Johnston Superior Court.
On the trial the widow of the deceased gave evidence for the State, in substance and almost literally, the same as that (345) given by her on the former trial, as stated in the report of the case in this Court.
On the part of the prisoner, Robert Flowers was examined as a witness. He was a son of the deceased, and was fifteen or sixteen years old at the time of the homicide; and he stated: That he was not at home until late in the day on which the homicide was committed; that when he went into the house he saw the prisoner sitting on a table with a gun in his hand, and that he requested the prisoner to give it to him, and he immediately complied; that he went out of doors, and when he came back he found the prisoner lying on the bed, and that his father sent him to draw some liquor, and when he returned he found his father sitting on a chair near the door; that some angry words passed between his father and the prisoner, and that the latter was standing near the middle of the room and cursed the *Page 253 
liquor; that his father rose up and took a light chair in his hand and pitched it over the head of the prisoner without touching him, and, as the witness believed, without intending to strike the prisoner; that in doing so his father staggered and fell, when the prisoner rushed upon him instantly and stabbed him; that he did not see the prisoner have a knife in his hand when he first came towards his father, but he saw the prisoner draw it from his pocket at or about the time his father raised the chair; that immediately after his father was stabbed, he got up and went towards the door, and the prisoner followed him, and stabbed him in the back, and his father then went to the bed, laid down, and in a few minutes died; that he did not see his mother assist his father to get up, or to get to the bed, and that he thought, if it had been so, that he would have seen it; that after his father was dead he went out of the house and saw the prisoner at the gate, and asked him "why he had killed his father," to which the prisoner replied, "that if he did not clear out he would send him off with a cut throat."
The case further states that the prisoner then examined (346) as a witness John Flowers, another son of the deceased, a little younger than his brother Robert, and that he testified to the same facts, except that he said the prisoner was advancing on his father when he raised the chair.
The counsel for the prisoner then offered to prove by a witness who had formerly lived with the deceased, that his general character was that of a violent, overbearing, and quarrelsome man, and that such were his domestic habits. On objection made on the part of the State, the court rejected the evidence.
On the part of the prisoner a witness named Cobb was examined, and stated that he was one of the jury at the coroner's inquest over the body of Flowers, and that Mrs. Flowers swore on that occasion that she was not in the house when the fatal rencounter took place, but that she became alarmed and had left the house before it happened.
On cross-examination he was asked whether he had not told two persons, named Hicks and Lane, that Mrs. Flowers swore before the jury of inquest that she was in the house and saw the transaction; and he denied that he ever made such a statement to them or either of them. On the part of the State Hicks and Lane were afterwards called to prove that Cobb did state to them that Mrs. Flowers swore before the jury that she was in the house and witnessed the rencounter. This testimony was objected to by the prisoner's counsel, but received by the court. *Page 254 
The counsel for the prisoner insisted before the jury that Mrs. Flowers was not entitled to credit; and that, taking the case on the testimony of the two sons, there was such a provocation as mitigated the killing to manslaughter.
The presiding judge charged the jury that, if Mrs. Flowers was to be believed, the prisoner was guilty of murder; but if they did not believe her, then they would look to the testimony of Robert and John Flowers in order to ascertain the (347) degree of homicide; and in relation to their evidence, the court stated to the jury that if the deceased pitched the chair over the head of the prisoner without intending to strike him, and that was manifest to the prisoner, there was no such legal provocation as would mitigate the killing to manslaughter, but the prisoner would, in that view of the case, also, be guilty of murder.
The jury convicted the prisoner of murder, and his counsel moved for avenire de novo because of the rejection of the evidence offered by him and of the admission of that of Hicks and Lane to contradict Cobb, and for misdirection. The court refused the motion, and, after sentence of death the prisoner appealed.
Although it was not contended on the trial that the offense of the prisoner did not amount to murder, if the account given by the widow of the deceased was true, yet, as the case comes here, that question is one of those to be considered by this Court. Upon it we must say that it admits of no doubt that it was murder, according to her account. She stated that after some angry words on each side the prisoner, with his knife drawn, approached the deceased, thrusting at him, and that the deceased then raised the chair and pitched it over the other's head, but without striking or intending to strike him, and that in making that effort he staggered from drunkenness and fell, and that then the prisoner, who, though he had been drinking, was not drunk, rushed on the deceased, while down, and stabbed him several times; and, moreover, that she assisted her husband to rise, and that, after he had done so, the prisoner pursued him and again stabbed him in the back once or twice. This represents the prisoner, in every respect, as (348) the aggressor, and grossly so, intending, and in the act of making on the deceased, a deadly assault with a drawn knife, as the beginning of the affray, and executing that *Page 255 
intention (without receiving a blow from the deceased or an attempt to give one) by stabbing the man to death, while he was helpless on the floor, or, after rising, while retreating. Thus represented, there is nothing in the transaction to extenuate the killing from murder of a very dark hue, perpetrated in a cruel and diabolical fury.
The character of the killing does not seem to be materially varied, in a legal sense, by the testimony of the sons. One of them said expressly that the prisoner was advancing on the deceased when he raised the chair. The same is to be implied from the testimony of the other, "that he did not see the prisoner have a knife in his hand when he first came towards the deceased, but saw him draw it at or about the time his father raised the chair." Then, it must be taken that the prisoner, upon angry words, was advancing in a hostile manner upon the deceased, and drew his knife as he went, and that, at or about that instant, the deceased raised and pitched a light chair over the prisoner's head, without intending to strike him, but only in order to check the attack, and although it was "manifest" to the prisoner that the deceased did not intend to strike him, and in fact he had not done so, that the prisoner continued to press on the other, who had reeled and fallen, and killed him by repeated stabs before and behind, the deceased being all the time down and unresisting, or retreating. If necessary, it might well be considered whether a killing in this ferocious manner a man in the condition of the deceased would not be murder, though there had been a slight blow with a chair, given by him when so drunk and weak as not to be able to stand up, to another then advancing for the purpose of combat with a deadly weapon drawn before receiving the blow. But we do not pursue that view of the subject, because, in fact, no blow was given (349) to the prisoner, nor any intended; and, therefore, there could be no provocation to palliate the killing from murder, since, from a reasonable regard for the security of human life, it has been long and perfectly settled that no words or gestures, nor anything less than the indignity to the person of a battery, or an assault at the least, will extenuate a killing to manslaughter. To constitute an assault there must be an attempt or offer to strike by one within striking distance. And here both the witnesses and the jury concur in saying there was no intention to strike, and that it was clear and evident to the prisoner that there was not. The Court is, therefore, of opinion that there was in the instructions to the jury no error to the prejudice of the prisoner. *Page 256 
It is of great importance to the due dispatch of business and the correct decision of controversies that no evidence should be heard which is foreign to the issue; and this rule is no less applicable and useful in criminal than in civil cases. Upon, this principle, and because, if received, the evidence of the general character and habits of the deceased as to temper and violence could not rationally and legally affect the degree of homicide in this case, but might mislead the jury, the Court holds that it was properly excluded.
The law no more allows a man of bad temper and habits of violence to be killed by another, whom he is not assaulting, than it does the most peaceable and quiet of men. But it is said that it ought to be heard as some evidence — to weigh with the jury — that the deceased, being habitually a brawler and breaker of the peace, was, probably, in this particular controversy, the aggressor, or, at least, that the slayer might for that reason have thought himself in danger from him, and acted on that apprehension. Now, no such principle or decision is found as that a person may kill another because from his former course of life, as a fighter, he apprehends an assault from him, (350) though it be even a violent one. A person may, indeed, receive such sure information of the intention of another to attack his life upon sight as to cause him fully to believe it; and, in a moral point of view, he may in such a case be excused for getting the advantage on a favorable opportunity and killing first, or even for seeking private means of killing the other, in order, as he thinks, to save his own life. The pardoning power would, doubtless, be strongly moved by those palliating considerations to stay the punishment annexed by the law to the offense. But it is clear that the legal guilt would be that of murder, because there was not at the time a pressing necessity to kill, arising out of an assault and immediate danger to the person killing, nor any accompanying provocation to arouse the passions and acted on before the passions had cooling time. It would be murder, because the killing would be deliberate; and we know of no deliberate killing that is not murder, unless it be commanded by the law or justified by the urgent necessity of self-defense, when the party is in impending peril of the loss of life or great bodily harm from an actual and unavoidable combat. It is too much to stake the life of one man upon the fears of another of danger from him, merely upon his character for turbulence, and when he is making no assault. Such would be the case here if the evidence had been received, for the prisoner's own witnesses proved that there was no assault on him. It is the fact, and not the fear of an assault, that extenuates the *Page 257 
killing, upon the supposition that it instantly rouses the resentment to an uncontrollable pitch. It is possible, when the case is one of circumstantial evidence and there is no direct proof of the quarrel and combat, that evidence of the character of the deceased might be mercifully left to the jury in aid of their inquiries into the origin and progress of the conflict in which the prisoner took the other's life. It was allowed, and on that principle, in S. v. Tackett, 8 N.C. 211. That is the only instance in which, even in a case of circumstantial evidence, such proof was held to be proper, as far as our researches (351) and those of the bar have discovered. It is stated in the notes on the American edition of Phillips on Evidence, as a solitary case, and as one in which the Court admitted that such evidence must be confined to the killing of slaves. Cowen and Hill's notes to Phill. on Ev., 461, note 345. Although the case is not, we think, obnoxious to the sneer of the annotator in respect to its application to the killing of slaves alone, yet we cannot act on it as an authority in this case. It does not process to be founded on any precedent, and the reasoning of the Court confines its application to the case of presumptive evidence before it, in which there was "not any direct proof" of the immediate provocation or circumstances under which the homicide was committed. In such a case the Court say if the general behavior of the deceased was marked with turbulence and insolence, it might, in connection with the threats, quarrels and other existing causes of resentment against the prisoner,increase the probability that the latter had acted under strong and legal provocation while, on the contrary, if the behavior of the deceased was usually mild and respectful towards white persons, nothing could be added by it to the force of the othercircumstances. It is plain, therefore, that the decision is put distinctly upon the ground that the case was one of circumstantial evidence only, in which the existence or want of provocation was matter merely of presumption, to be deduced, therefore, by the jury from every slight thing that could add a shade to the presumption favorable to the accused. The case has never come directly under consideration hitherto, though it was urged inS. v. Tilley, 25 N.C. 424, where evidence nearly of the same kind was rejected, and in which the judges meant to intimate their doubts of it by saying that temper and deportment, "if they were evidence at all," were to be established as facts, and not by reputation. But whether S. v. Tackett be (352) law or not, it has no application here, because this is a case of the opposite kind — one in which three witnesses were present from beginning to end, who depose directly to the *Page 258 
different occurrences, and even those who were called by the prisoner prove affirmatively that the deceased did not make an assault or give the prisoner any legal provocation, but that the prisoner was the aggressor. What possible legitimate end could evidence of the character and temper of the deceased answer in that state of facts? If good, and there was direct evidence that the deceased assaulted the prisoner, it would not aggravate the prisoner's guilt and make it murder. So, if bad, it could not mitigate it to manslaughter, where it appears directly that notwithstanding his temper he was for that time, at all events, not in fault, but that the prisoner was. The evidence of the deceased's character neither disproves the facts proved by the witnesses nor impeaches their credibility. For these reasons, and because we think, if there were any such general rule of evidence as that urged for the prisoner, it would have been laid down in some one of the numerous treatises on this branch of the law, the Court holds the evidence was properly rejected.
Upon the other point of evidence the opinion of the Court has been given in Edwards v. Sullivan, ante, 302; and the reasons are there so fully stated as to leave nothing to be added.
There is, therefore, no ground for a venire de novo. But, upon the supposition that he might fail on that part of the case, the counsel for the prisoner here also moved in arrest of judgment.
The first reason assigned is, upon the authority of S. v.Twitty, 9 N.C. 248, because the affidavit of the prisoner, on which he moved and the court ordered the removal of the trial to Johnston, is not set forth in the transcript from Cumberland. If, that were material, it would be the duty of the Court (353) to have the omission supplied and the transcript completed by the insertion of the affidavit. S. v. Upton,12 N.C. 513; Ballard v. Carr, 15 N.C. 575; S. v. Reid, 18 N.C. 377. But since S. v. Seaborn, 15 N.C. 305, it has been considered by all the judges of this Court, and we believe, by the profession generally, that the affidavit for removal ought no more to be a part of the record than one for continuance. It is evidence to the presiding judge, and his determination of the question of removal, for the causes suggested, is final, like every other decision of a matter of fact by him.
A second reason in arrest is that the record does not show a venirefacias, either original or special, to the term of Johnston Court, at which the prisoner was tried, but merely sets forth a jury of twelve freeholders, who tried and convicted the prisoner. That is sufficient. It is according to the settled course, to which *Page 259 
no exception is remembered. It is the practice in making up the record to set forth the venire at the term at which the indictment was found, in order, we suppose, to show that the grand jury was properly constituted. That practice it is well enough to continue, though it does not seem essential, as it has been often decided that objection can be taken to the competence of grand jurors only before plea in chief, or, at all events, before trial. Therefore, after conviction it must suffice if the record show a grand jury of the requisite number of good and lawful men, upon whose oaths the accusation was presented, without designating the mode of their selection. But in no instance has the venire been set out in the record in order to show a proper constitution of the petit jury. If it happen that the trial is at the term at which the indictment is found, then the venire appears. But even then, if one or more talesmen be of the jury, it will not appear how he or they were selected; and when the trial is at a subsequent term, no venire for that term ever appears in the record, but only that a jury composed (354) of twelve certain good and lawful men upon their oaths found the prisoner guilty. The reason is that in our law a venire is not issued for each case, either originally or to supply a defect of jurors. The statute directs a general venire for not less than thirty nor more than thirty-six freeholders, to attend the court during the whole term or until discharged; and, further, in order that there may be no defect of jurors, that the sheriff shall summon, from day to day, of the by standers, other jurors, being freeholders, to serve on the petit jury during that day, "for the trial of all cases," and not any particular one. In respect to talesmen, then, there is no venire, but any freeholder in court is competent and may be called in (S. v. Lamon, 10 N.C. 175); and as the whole jury may be constituted of talesmen, the venire facias for the original panel need not be set out, since, whether the jury be constituted of persons taken from it or from the bystanders, it is equally legal. It is true, both the State and the traverser have the right to a jury of the original panel, if it can be had; and it is, therefore, error to refuse it. But when a question of that kind arises it may be put on the record with a statement of the facts directly on which the exception is founded. It is not necessary that it should in the first instance appear that the jury was or was not composed either wholly or in part of the original panel; but it is presumed the court proceeded rightly and regularly in forming the jury, and in the trial, unless the contrary appear.
PER CURIAM. No error. *Page 260