## STATE v. AARON ARTIS.

(Filed 21 March, 1951.)

**1. Homicide § 25—**

　　Evidence tending to show that after an altercation between landlord and tenant as to whether the landlord should keep his dog in the tobacco barn near the tenant's house, both the parties armed themselves, and that as the landlord was passing through defendant tenant's yard, presumably on the way to the tobacco barn with the dog, defendant fired from the house inflicting mortal injury, *is held* to require the overruling of defendant's demurrer to the evidence, notwithstanding that defendant's evidence, if believed, would justify a self-defense acquittal.

**2. Criminal Law § 81c (5)—**

　　Where defendant is convicted of manslaughter upon evidence fully justifying the verdict, alleged error relating to the charge of murder in the second degree cannot be prejudicial.

APPEAL by defendant from *Carr, J.,* November Term, 1950, of WAYNE.

Criminal prosecution on indictment charging the defendant with the murder of Jim Henry Gardner.

In apt time, the solicitor announced that he would not put the defendant on trial for murder in the first degree, but would ask for a verdict of guilty of murder in the second degree or manslaughter as the evidence might disclose. *S. v. Wall,* 205 N.C. 659, 172 S.E. 216.

The relation of the deceased and the defendant was that of landlord and tenant. The two lived about 100 yards apart. There were two barns on the premises leased by the defendant, a corn barn or feed barn and a tobacco barn. The corn barn or feed barn was used jointly by the two, the landlord using the left side for his farming tools, hay and feed, and the defendant using the right side for his corn, feed and livestock. The landlord also kept some of his farming utensils under the shelter of the tobacco barn.

During the latter part of September, 1950, the landlord housed his oldest son's dog in the feed barn, which was near the defendant's house; in fact, in the edge of the back yard only a short distance of the defendant's living quarters. The dog kept so much noise at night, constantly barking, that the defendant threatened to kill the dog to get rid of it. On Sunday morning, 1 October, 1950, the landlord, together with his son Jimmie and grandson, Antoni Anderson, went over to the defendant's place to feed the hogs. The landlord went into the field to get some corn for the pigs, while the boys gave them the slops. The boys then took the dog and put it in the landlord's chicken house, returning to the defendant's home about the time the landlord came from the field with the corn for the pigs.

The evidence is in conflict as to what transpired thereafter. It seems the defendant did not object to having the dog put into the tobacco barn which was some distance from his house, but insisted that the dog could not be kept in the corn barn because it worried him. Then according to the State's evidence, "he got mad and went into the house and got his rifle; said the dog could not be put in the feed barn, and if it were he would kill him."

Words were exchanged between the defendant and his landlord, the latter leaving to get the dog to "put him in the tobacco barn," according to the State's evidence, and according to the defendant's evidence, "Mr. Gardner says, 'You stay here until I come back and when I come back me or you one is going to die.'" And further: "Mr. Gardner said, 'Aaron, I am going to get that dog and put him back in that barn. It is my dog and my barn, and I am going to put him there.'"

At any rate, the landlord did go to his house, got his gun and loaded it, and returned with the dog, leading him by a rope and chain. In going to the tobacco barn, if that were his destination, he would needs pass through the defendant's front yard. The witnesses on both sides were fearful of what a meeting of the two might portend.

When the landlord reached the defendant's front yard and had entered only a short distance, the defendant fired his rifle, shot him over the heart and killed him instantly.

The State's evidence is to the effect that the deceased was carrying his gun on his shoulder when he entered the yard, while the defendant says he had it in firing position "something like this" (indicating), and he warned the deceased not to approach nearer in his menacing attitude, but he paid no heed.

The defendant contended that he shot only in self-defense, and his witnesses were positive in their testimony in his behalf.

The State's witnesses were equally certain of their testimony. The deceased was hard of hearing and poor of vision. "My father could not hear but very little. . . . He was almost blind." The defendant immediately fled and was sought by the officers all day, finally being arrested about 9:00 p.m. that night.

Verdict: Guilty of manslaughter.

Judgment: Imprisonment in the State's Prison for a term of not less than 7 nor more than 10 years.

The defendant appeals, assigning errors.

*Attorney-General McMullan and Assistant Attorney-General Moody for the State.*

*Herbert B. Hulse and Scott B. Berkeley for defendant.*

STACY, C. J. The appeal challenges, first, the sufficiency of the evidence to overcome the demurrer, second, the submission of the charge of murder in the second degree, and, third, the correctness of the instructions to the jury.

The State's evidence readily supports the verdict. The defendant's evidence, if believed, would have justified a self-defense acquittal. And even if the weight of the evidence seem to bear in favor of the defendant, we cannot say there was error in submitting the case to the jury. They are the triers of the facts. The credibility of the evidence is for them. The court ruled properly in denying the motion for judgment as in case of nonsuit. Indeed, the presumptions arising from an intentional killing with a deadly weapon, to wit, unlawfulness and malice, required a jury verdict. *S. v. Chavis,* 231 N.C. 307, 56 S.E. 2d 678; *S. v. Childress,* 228 N.C. 208, 45 S.E. 2d 42; *S. v. Brooks,* 228 N.C. 68, 44 S.E. 2d 482; *S. v. DeMai,* 227 N.C. 657, 44 S.E. 2d 218; *S. v. Staton,* 227 N.C. 409, 42 S.E. 2d 401; *S. v. Vaden,* 226 N.C. 138, 36 S.E. 2d 913; *S. v. Robinson,* 226 N.C. 95, 36 S.E. 2d 655; *S. v. Rivers,* 224 N.C. 419, 30 S.E. 2d 322; *S. v. Todd,* 224 N.C. 358, 30 S.E. 2d 157; *S. v. Burrage,* 223 N.C. 129, 25 S.E. 2d 393; *S. v. Keaton,* 206 N.C. 682, 175 S.E. 296; *S. v. Gregory,* 203 N.C. 528, 166 S.E. 387.

The defendant complains that the charge of murder in the second degree should not have been submitted to the jury, and that otherwise error was committed in the trial of this charge. Even so—though no error in this respect appears on the record—the defendant is in no position to take advantage of it, since he was convicted of the lesser offense of manslaughter and the evidence fully justifies the conviction. *S. v. Beachum,* 220 N.C. 531, 17 S.E. 2d 674; *S. v. Blackwell,* 162 N.C. 672, 78 S.E. 316.

The occurrence here was quite a needless tragedy. Both of the principals were a little too insistent upon their rights. Each made the mistake of arming himself. In this respect the defendant seems to have been the first offender. But, then, we are looking at the events of the day in retrospect. If the parties themselves had it to go over, they too might, and doubtless would speak and act differently. It is easy to be wise in the aftertime. Many there are who will learn only in the school of experience—that school exclusively reserved for those who will learn in no other. Its lessons are hard and it is usually thorough in its teachings, as all who are connected with this case will now quite readily agree.

No error appears in the charge as given or in the refusal to charge as requested. The whole case was largely one of fact determinable alone by the jury. We find no error in the trial. The verdict and judgment will be upheld.

No error.