STATE OF NORTH CAROLINA v. RUFUS COLEY WATSON, JR.

No. 65

(Filed 6 May 1975)

**1. Homicide §§ 6, 27— mere words doctrine — instructions**

The trial court properly instructed the jury that mere words will not excuse a crime of murder and that words and gestures alone, where

State v. Watson

no assault is made or threatened, do not constitute adequate provocation to reduce murder to manslaughter.

**2. Homicide § 28— words calculated to provoke assault — failure to instruct**

The trial court in a homicide prosecution did not err in failing to instruct the jury on the effect of language "calculated and intended" to bring on an assault where there was no evidence that defendant killed the deceased in self-defense and all the evidence tended to show that the fatal attack was brought on by the continued verbal abuses directed by deceased toward defendant.

**3. Criminal Law § 114— instructions — unwritten prison code**

In a prosecution for homicide committed while defendant and deceased were prison inmates, the trial court did not err in instructing the jury that the case is to be tried under the laws of the State and not under the customs and unwritten code existing within the prisons.

**4. Homicide § 25— instructions — cool state of blood**

The trial court in a first degree murder case did not err in instructing that a cool state of blood "does not mean the absence of passion or emotion, anger or emotional state, unless the emotion was such at the time to disturb the defendant's faculties and reason to the extent that he could not form a deliberate purpose and control his actions."

**5. Criminal Law § 34— evidence of another crime — admissibility**

In this homicide prosecution, evidence as to defendant's possession of a kitchen paring knife in violation of prison rules was admissible as circumstantial evidence of a planned killing.

**6. Criminal Law §§ 65, 71—shorthand statement of fact**

In this homicide prosecution, testimony describing the way defendant crossed a corridor and approached deceased as "Spirit of the moment" was admissible as a shorthand statement of fact or as lay testimony on the mental capacity and condition of defendant; however, the exclusion of such testimony did not constitute prejudicial error.

**7. Criminal Law § 113— summary of evidence — expression of opinion — misstatement**

In this homicide prosecution, the trial court did not imply that deceased had withdrawn from the controversy in its summary of the evidence, nor did the court commit prejudicial error in misstating the time interval between decedent's departure from defendant's bunk in a prison dormitory and defendant's attack on decedent.

DIRECT appeal pursuant to G.S. 7A-27 (a) to review defendant's trial before *Bailey, J.,* at the 7 October 1974 Criminal Session of WAKE County Superior Court.

On 20 May 1974 the Wake County Grand Jury returned a "true bill" of indictment charging defendant, Rufus Coley

Watson, Jr. (hereinafter sometimes referred to as Watson or as defendant), with the first-degree murder of Roger Dale Samples (hereinafter sometimes referred to as Samples or as decedent) on 13 May 1974. At the 7 October 1974 Criminal Session of Wake County Superior Court defendant was arraigned and entered a plea of not guilty. Thereafter, following the presentation of the State's case, defendant offered no evidence and rested. The jury returned a verdict finding defendant guilty of second-degree murder. Judge Bailey entered judgment on this verdict sentencing defendant to life imprisonment, said sentence to commence at the expiration of a sentence defendant was then serving.

At trial, the State's evidence, summarized except where quoted, tended to show the following.

The killing occurred at the Polk Youth Center unit of the North Carolina Department of Correction. This unit is located in Raleigh. Specifically, the incident occurred in I-Dorm, which constituted one wing of the 300 building at Polk. I-Dorm can be described as an open-type single-story structure similar in interior design to the traditional army barrack. On 13 May 1974 there were approximately forty inmates housed in I-Dorm. They slept in twenty double bunk beds, three feet apart, ten of which were located on each side of the large rectangular sleeping area. An aisle, seven feet in width, separated the two rows of beds. It appears from the record that the majority of the I-Dorm inmates were assigned to kitchen duty at Polk. Both defendant and decedent lived in I-Dorm and worked in the kitchen.

At the time of this incident, defendant, a black, was twenty-years-old. He was serving a twenty-five year prison sentence on judgment imposed at the October, 1972, Session of Rockingham County Superior Court upon his plea of guilty to second-degree murder. The decedent, Samples, was white. Neither Samples' age nor the basis for his incarceration appears from the record.

Five inmates, previously sequestered, were called as witnesses for the State. All were residents of I-Dorm on the day in question. Although there were some discrepancies in how they recalled the incident, their testimony as to the events leading up to the killing was essentially the same. This combined

testimony, summarized in factual form, except where quoted, is as follows.

The defendant was called "Duck" by his fellow prisoners in I-Dorm. Samples, the decedent, was known as "Pee Wee." Although Samples was referred to as "Pee Wee," there appeared to be no relation between this nickname and his physical size. In fact, he was a strong man who worked out daily with weights.

The "hearsay" among the residents of I-Dorm was to the effect that Watson and Samples were "swapping-out." "Swapping-out" is a prison term that means two inmates are engaging in homosexual practices. Generally, prisoners that are "swapping-out" try to hide the practice from their fellow inmates. In particular, they try to hide it from any "home-boys" that may be in their particular unit. A "home-boy," in the prison vernacular, is a fellow inmate from one's own hometown or community. One of the State's witnesses, Johnny Lee Wilson, a resident of I-Dorm on the date of the offense, was Samples' "home-boy."

It appears that Watson and Samples had been "swapping-out" for several months. Approximately a month or so prior to the date of the killing, Watson and Samples had engaged in a "scuffle" while working in the prison kitchen. This appears to have been nothing more than a fist-fight. Samples was the winner. Although it is by no means clear from the record, it appears that this "scuffle" arose out of Samples' suspicion that Watson had been "swapping-out" with another prisoner.

At approximately 4:30 p.m. on the afternoon of the killing, Johnny Lee Wilson, Samples' "home-boy," saw Watson and Samples sitting together on a bunk in the back of I-Dorm. At this time, "they were close talking, they were close." Apparently, assuming that they were about to "swap-out," and not wanting to embarrass Samples, Wilson quickly turned around and left the dorm.

The authorities at Polk Youth Center conduct a "head count" every evening at 7:30 p.m. At this time, all of the prisoners are lined up in front of their respective dormitories. Following the count, the prisoners usually return to their respective dorms and watch television, write letters, etc. The lights in all of the dorms are "dimmed" at approximately 10:00 p.m. This is what the prisoners refer to as "lights out." During the remainder of the night, all the dorms remain partially lighted.

State v. Watson

On the evening of 13 May 1974, following the "head count," Watson and Samples reentered I-Dorm. Thereafter, from approximately 8:00 p.m. until 10:00 p.m. (lights out), they were observed sitting on two adjacent bottom bunks, one being the bed directly under Samples' top bunk, "shooting the breeze."

Shortly before the lights were to be dimmed (10:00 p.m.), Watson and Samples began to argue. After several minutes, Watson got up and walked across the aisle, a distance of approximately seven feet, to his bunk. Samples subsequently followed him and renewed the dispute. At this time, both parties were seated on Watson's bottom bunk. During the course of the renewed argument, Samples was verbally abusing Watson and challenging him to fight. At one point, he said: "Nigger, nigger, nigger, you're just like the rest of them." He also told Watson that he was too scared to fight him and that all he was going to do was tremble and stay in his bunk. Finally, Samples made several derogatory and obscene references to Watson's mother. The prisoners refer to this as "shooting the dove." Generally, when a prisoner "shoots the dove," he expects the other party to fight. At this point, Watson told Johnny Lee Wilson, whose bunk was nearby on Watson's side of the room: "You better get your home-boy straightened out before I f—— him up." Responding to this statement, Samples said: "Why don't you f—— me up if that's what you want to do. All you're gonna do is tremble, nigger."

As Samples was making the above quoted statement, he was walking over to Wilson's bunk. Samples borrowed a cigarette from Wilson and then proceeded to his own bed. He got up in his bunk (top) and was more or less half sitting up with his back propped up against the wall. At this point, he renewed the argument with Watson, who was still in his bottom bunk on the opposite side of the room. He called Watson a "nigger" and "a black mother f——." While this was going on, Watson, without saying a word, either walked or ran across the aisle between the two rows of bunks and violently and repeatedly stabbed Samples with a kitchen-type paring knife. According to the State's witnesses, this occurred approximately two (2) to ten (10) minutes after Samples had left Watson's bed.

Lt. Carmen Phillips was in charge of all the dormitories at Polk Youth Center on the night in question. On 13 May 1974 he left his office to check on the dorms at approximately 10:05 p.m. When he reached I-Dorm he stopped and started talking

to two or three of the inmates through bars that separated the sleeping area from the outside hallway. As he was talking to one of the inmates, he heard the following statement repeated twice inside the I-Dorm sleeping area: "I'll kill your god—— ass." Lt. Phillips backed up to where he could see in between the I-Dorm bars, and saw "a black hand, a swift up and down motion, like [it] was beating a man laying on the bed." At this point, Lt. Phillips ordered the men to stop fighting. He immediately proceeded to the doorway that led into the sleeping area. Once inside, he saw Watson standing in the aisle at the end of Samples' bunk bed. He was talking to another prisoner. Lt. Phillips heard him make the following statement: "I told the man to quit running his mouth at me." He immediately ordered Watson to come to the doorway area. Watson obeyed this order and when he arrived he gave Lt. Phillips a paring knife and told him that he had "done it."

Samples was immediately taken to the first-aid facility at Central Prison near downtown Raleigh. He was pronounced dead on arrival. A subsequent medical examination of the body revealed approximately fourteen to sixteen deep puncture wounds and lacerations. Samples died as a result of these wounds.

Although there had been stabbings and cuttings at Polk Youth Center on prior occasions, this was the first such incident that resulted in a prisoner's death.

Other facts pertinent to decision will be set forth in the opinion.

*Attorney General Rufus L. Edmisten by Associate Attorney Raymond L. Yasser, for the State.*

*Wright T. Dixon, Jr., for defendant appellant.*

COPELAND, Justice.

Defendant has brought forward thirteen (13) of thirty-four (34) assignments of error in his brief, the others having been abandoned. Rule 28, Rules of Practice in the Supreme Court. *Investment Properties v. Allen,* 281 N.C. 174, 188 S.E. 2d 441 (1972); *Knutton v. Cofield,* 273 N.C. 355, 160 S.E. 2d 29 (1968); *Pendergrass v. Massengill,* 269 N.C. 364, 152 S.E. 2d 657 (1967).

Defendant contends in his first series of assignments (Nos. 25, 30 and 33) that the trial court erred in charging the jury as to the type of provocation that could mitigate the killing to voluntary manslaughter. Specifically, defendant excepted and assigned error to the following italicized portions of the court's charge:

(1) After summarizing the evidence, and prior to fully instructing on first-degree murder, the court stated: "*[L]et me say here, that mere words will not form a justification or excuse for a crime of this sort. . . .*"

(2) In instructing the jury on voluntary manslaughter, the court stated: "[T]he defendant must satisfy you that this passion was produced by acts of Samples which the law regards as adequate provocation. This may consist of anything which has a natural tendency to produce such passion in a person of average mind and disposition. *However, words and gestures alone, where no assault is made or threatened, regardless of how insulting or inflammatory those words or gestures may be, does not constitute adequate provocation for the taking of a human life; . . .*"

Defendant brings forward two distinct, yet closely related, arguments in support of these assignments. We shall proceed to consider these contentions in the order set forth in defendant's brief.

A. *Mere Words as Sufficient Legal Provocation.*

[1]  Defendant concedes that the above italicized portions of the court's charge represent a correct statement of the common law, accepted and recognized as the law of this State from the first reported cases. *See, e.g., State v. Tackett,* 8 N.C. 210, 219 (1820) ; *State v. Merrill,* 13 N.C. 269 (1829) ; *State v. Hill,* 20 N.C. 629, 635 (1839) ; *State v. Jarrott,* 23 N.C. 76, 82 (1840) ; *State v. Barfield,* 30 N.C. 344, 349 (1848) ; *State v. Howell,* 31 N.C. 485 (1849). *See also* 7 Encyclopedic Digest of N. C. Reports, Homicide § 39 (1918). Defendant further concedes that this rule is almost uniformly recognized throughout the United States. *See, e.g.,* Annot., 2 A.L.R. 3d 1292 (1965) ; 40 Am. Jur. 2d Homicide § 64 (1968) ; 40 C.J.S. Homicide § 47 (1944). Nonetheless, defendant contends that the doctrine in this State has gradually evolved into a *per se* rule that is not in accord with early judicial pronouncements of this Court. Therefore, he urges

us to modify the present rule. In support of this contention, defendant relies heavily on language contained in the following three cases: *State v. Norris*, 2 N.C. 429 (1796) ; *State v. Tackett, supra;* and *State v. Jarrott, supra.*

Initially, we point out that *State v. Norris, supra,* is not an opinion of this Court. It is simply a summarized report of the actual trial of defendant over which Judges Williams and Haywood jointly presided as circuit superior court judges. There were only four such judges in this State at that time and further there was no appellate court. *See* Clark, C.J., History of the Supreme Court of North Carolina, 177 N.C. 617, 619 (1919). The language defendant cites in his brief as the opinion of the Court is merely Judge Haywood's charge to the jury. We note that in his separate charge, Judge Williams told the jurors that he disagreed with certain portions of the law as previously stated by Judge Haywood and proceeded to instruct in accord with his own views. Accordingly, under these particular facts, this reported proceeding has no precedential value.

On the other hand, both *Tackett* and *Jarrott* are decisions of this Court and both contain language that tends to support defendant's contention. However, the exceptions to the "mere words" doctrine recognized in both cases are totally without relevance today. In any event, any language in these cases not in accord with the following statement of Justice Stacy (later Chief Justice), speaking for the Court in *State v. Benson,* 183 N.C. 795, 799, 111 S.E. 869, 871 (1922), is expressly overruled. "The legal provocation which will reduce murder in the second degree to manslaughter must be more than words; as language, however abusive, neither excuses nor mitigates the killing, and the law does not recognize circumstances as a legal provocation which in themselves do not amount to an actual or threatened assault. [Citations omitted.]" This assignment of error as it relates to the mere words doctrine is overruled.

B. *What Constitutes an Assault?*

[2]  Defendant contends that since the trial court inserted the "mere words" doctrine into its charge it constituted prejudicial error not to proceed further and charge on what he calls the law of assault from provoking language. Defendant relies on the following cases in support of this argument: *State v. Perry,* 50 N.C. 9 (1857) ; *State v. Robbins*, 78 N.C. 431 (1878) ; *State v. Chavis,* 80 N.C. 353 (1879) ; *State v. King,* 86 N.C. 603

(1882) ; *State v. Fanning,* 94 N.C. 940 (1886) ; *Saunders v. Gilbert,* 156 N.C. 463, 72 S.E. 610 (1911) ; *State v. Kennedy,* 169 N.C. 326, 85 S.E. 42 (1915) ; *State v. Crisp,* 170 N.C. 785, 87 S.E. 511 (1916) ; *State v. Baldwin,* 184 N.C. 789, 114 S.E. 837 (1922) ; *State v. Strickland,* 192 N.C. 253, 134 S.E. 850 (1926) ; *State v. Maney,* 194 N.C. 34, 138 S.E. 441 (1927) ; *State v. Robinson,* 213 N.C. 273, 195 S.E. 824 (1938) ; *State v. Hightower,* 226 N.C. 62, 36 S.E. 2d 649 (1946) ; *State v. Franklin,* 229 N.C. 336, 49 S.E. 2d 621 (1948) ; *State v. McLawhorn,* 270 N.C. 622, 155 S.E. 2d 198 (1967). This contention has no merit. Furthermore, it is logically inconsistent with the rule that language, no matter how abusive, is never sufficient legal provocation to mitigate a homicide.

Many of the above cited cases involve the defendant's right to the benefit of perfect self-defense and deal specifically with the question of whether the defendant was at fault in bringing on the difficulty. The test, long employed in such cases, is whether the defendant used language *calculated and intended* to bring on the fight. If he did, then he is deemed to have been at fault and loses the benefit of perfect self-defense. *See. e.g., State v. Robinson, supra; State v. Crisp, supra; State v. Lancaster,* 169 N.C. 284, 84 S.E. 529 (1915) ; *State v. Rowe,* 155 N.C. 436, 71 S.E. 332 (1911) ; *State v. Fanning, supra; State v. Davis,* 80 N.C. 351 (1879) ; *State v. Robbins, supra; State v. Perry, supra.*

*State v. Hightower, supra,* is an excellent example of the legal consequences of abusive language in this situation. In that case, defendant and deceased were both inmates confined in a prison camp located in Wilkes County. Sometime prior to the homicide, defendant had been placed in solitary confinement for a number of days. Defendant believed this confinement resulted from a report deceased had made to prison officials regarding alleged acts of sex perversion on his part. On the day of the killing, defendant came out into the prison yard where the deceased and others were passing a ball. He put his arm around the deceased and walked with him back into the cell block. Thereafter, defendant tripped and stabbed the deceased, and when, before dying, the deceased managed to get up and run to the sink, defendant caught up with him and stabbed him five or six more times, stating: "G— d— you, I told you I was going to kill you." Defendant contended that deceased had called him a "G— d— black s.o.b." and that this had provoked the assault.

State v. Watson

Defendant was tried before Judge Bobbitt (later Associate Justice and Chief Justice of this Court) at the August 1945 Session of Wilkes County Superior Court. Upon a verdict finding him guilty of first-degree murder, defendant appealed to this Court and assigned as errors, inter alia, the portion of the court's charge on the "mere words" doctrine and the failure of the court to charge on excusable homicide. This Court, in an opinion by Justice Barnhill (later Chief Justice), affirmed the judgment and answered these contentions as follows:

> "The court further instructed the jury 'that legal provocation that will reduce murder in the second degree to manslaughter must be more than mere words, for language, however abusive, neither excuses nor mitigates the killing,' and 'the law does not recognize circumstances as a legal provocation which in themselves do not amount to an assault or a threatened assault.' Such is the law in this jurisdiction. [Citations omitted.] *Here it was the deceased and not the defendant who is alleged to have used abusive language and thus induced the assault which resulted in death. S. v. Robinson,* 213 N.C., 273, 195 S.E., 824; *S. v. Rowe,* 155 N.C., 436, 71 S.E., 332; *S. v. Crisp,* 170 N.C., 785, 87 S.E., 511." 226 N.C. at 65, 36 S.E. 2d at 651. (Emphasis supplied.)

These decisions establish the following rules as to the legal effect of abusive language: (1) Mere words, however abusive, are never sufficient legal provocation to mitigate a homicide to a lesser degree; and (2) A defendant, prosecuted for a homicide in a difficulty that he has provoked by the use of language "calculated and intended" to bring on the encounter, cannot maintain the position of perfect self-defense unless, at a time prior to the killing, he withdrew from the encounter within the meaning of the law. These two rules are logically consistent and demonstrate that abusive language will not serve as a legally sufficient provocation for a homicide in this State.

These well-settled rules are clearly controlling in the instant case. Hence, *if defendant had provoked an assault by the deceased* through the use of abusive language and had thereafter killed the deceased, then it would have been for the jury to determine if the lanuguage used by defendant, given the relationship of the parties, the circumstances surrounding the verbal assertions, etc., was "calculated and intended" to bring on the assault. If the jury had found this to be the case, then defend-

ant would not have had the benefit of the doctrine of perfect self-defense, even though the deceased instigated the actual physical attack. But, here there was no evidence that defendant killed the deceased in self-defense. In fact, all of the evidence tends to show that the fatal attack was brought on by the continued verbal abuses *directed toward defendant by the deceased.* Under these circumstances, there was no basis for a jury determination of whether any of the words were "calculated and intended" to bring on the difficulty. Therefore, we find no error in the court's instructions or in the court's failure to give instructions. These assignments are overruled.

At this point, we note that in those few jurisdictions that permit abusive language to mitigate the degree of homicide, the majority hold that the words are only deemed sufficient to negate premeditation, thereby reducing the degree of homicide from first to second. Most of these courts reason that since the deceased had made no attempt to endanger the life of the accused, the action of the latter in meeting the insulting remarks with sufficient force (deadly or otherwise) to cause the death of the former, was beyond the bounds of sufficient retaliation to constitute sufficient provocation to reduce the homicide to manslaughter. *See* Annot., 2 A.L.R. 3d 1292, 1308-10 (1965). Although we expressly decline to adopt this minority view, we note that the jury in the instant case apparently applied the same reasoning and found defendant guilty of second-degree murder. Thus, even if the minority rule applied in this State, defendant would not be entitled to a new trial as a result of the instructions here given.

[3] Defendant next contends (Assignment No. 29) that the trial court committed prejudicial error in charging the jury as follows:

"Now, ladies and gentlemen of the jury, this case is to be tried by you under the laws of the State of North Carolina, and not upon the rules and regulations and customs and unwritten code that exists within the walls of the North Carolina Department of Correction. I can't charge you on that law because I don't know that law. I think I know this one, and this is the law that you are trying this case under."

Defendant argues that this instruction "tends to discount as a matter of law all of the factual information" that the jury

was "entitled to consider, not as a law, but as a part of the factual background situation within which the incident took place." We find nothing in the charge to support such an inference. During the course of the trial, several of the State's witnesses (either present or former prison inmates) testified about a "prison code," i.e., a set of unwritten rules developed by the prisoners themselves. For example, one of the State's witnesses made the following statements on cross-examination:

> "In the prison system, if Watson had not fought after Samples had called him nigger, nigger, and talked about his mother, I guess, you know, everybody else probably would be jugging at him. What I mean by 'jugging at him,' I mean, messing with him, you know. Taking advantage of the fact that he won't stand up for himself. It is important that you stand up for yourself in the system because if you don't, somebody might get you down in the shower, you know. You might get dead-ended. It means if you don't take up for yourself, everybody picks on you."

Apparently, standing up for oneself was a vital part of this so-called "prison code." In this context, the import of the above instruction was clearly to inform the jurors that the case—like all other criminal cases tried in the North Carolina General Courts of Justice—had to be tried under the laws of this State and not upon any unwritten prisoners' code that existed within the walls of North Carolina's prisons. It is certainly not error for a trial judge to so instruct a jury. Furthermore, it appears that defendant's conduct even constituted a violation of the prisoners' code. We refer to the following re-direct testimony of the same witness previously quoted above: "Stand up for yourself in the prison system would not necessarily include using a knife. He could have run over there and fought with bare fists, that would have been standing up for himself . . . ."

Defendant's contention under this assignment is without merit. Therefore, it is overruled.

[4]   Defendant next assigns error (No. 32) to that portion of the trial court's charge on the element of first-degree murder that requires a defendant to act with deliberation. Specifically, defendant excepted to the following portion of the court's charge:

> "A cool state of blood does not mean the absence of passion or emotion, but it means that notwithstanding that

anger or emotional state, unless the emotion was such at the time to disturb the defendant's faculties and reason to the extent that he could not form a deliberate purpose and control his actions."

Defendant argues that the above language tends "to make the instruction one in which the Defendant is required to be 'temporarily deprived of intellect, and therefore not an accountable agent,' rather than swayed by passion." In substance, it appears that defendant's objection is directed to the meaning of "deliberation" as that term applies to first-degree murder. In *State v. Benson, supra,* in an opinion by Justice Stacy (later Chief Justice), this Court defined deliberation as follows:

"Deliberation means that the act is done in a cool state of the blood. It does not mean brooding over it or reflecting upon it for a week, a day, or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." 183 N.C. at 798, 111 S.E. at 871.

*Accord, State v. Johnson, supra; State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied,* 404 U.S. 840 (1971) ; *State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950) ; *State v. Steele,* 190 N.C. 506, 130 S.E. 308 (1925).

This Court has also defined "cool state of blood" as follows:

" 'Cool state of blood' does not mean the absence of passion and emotion, but an unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time unless such anger or emotion was such as to disturb the faculties and reason. [Citations omitted.]" *State v. Britt,* 285 N.C. 256, 262-63, 204 S.E. 2d 817, 822 (1974).

Although the *Benson* and *Britt* instructions are preferred, we find no fundamental difference between them and the instruction given in the instant case. In any event, since defendant was convicted of murder in the second degree, it is clear that any error in the judge's charge concerning the elements of first-

degree murder is harmless. *See, e.g., State v. Artis,* 233 N.C. 348, 64 S.E. 2d 183 (1951); *State v. Suddreth,* 230 N.C. 239, 52 S.E. 2d 924 (1949); *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7 (1939); *State v. Evans,* 177 N.C. 564, 98 S.E. 788 (1919). This assignment is accordingly overruled.

**[5]** In his next series of assignments (Nos. 5, 6, 7 and 8) defendant contends that the court erred in allowing, over his objection, testimony as to defendant's possession of a kitchen paring knife in violation of the rules of Polk Youth Center. This evidence was brought out by the district attorney during the redirect examination of two of the State's witnesses. Defendant argues that this evidence "comes within the prohibition against collateral circumstantial evidence to show the guilt of the defendant as to a particular crime," and that, in any event, the evidence was irrelevant and its admission was highly prejudicial. We disagree.

"Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; *but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to have been guilty of an independent crime.*" 1 Stansbury, N. C. Evidence § 91 (Brandis Rev. 1973) (Emphasis supplied.) *Accord, State v. Jones,* 278 N.C. 88, 178 S.E. 2d 820 (1971); *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969); *State v. Norkett,* 269 N.C. 679, 153 S.E. 2d 362 (1967); *State v. Choate,* 228 N.C. 491, 46 S.E. 2d 476 (1948).

In *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954), this Court, in an opinion by Justice Ervin, listed eight exceptions to the general rule of exclusion of evidence of a crime other than the one charged. This testimony clearly falls within the purview of Exception No. 2, i.e., a collateral act of the accused that tends to establish a specific intent or mental state that is an element of the crime charged. Certainly defendant's possession of the knife in contravention of well-known prison rules was admissible as circumstantial evidence of a planned killing. The "acid test" here is the logical relevance of this testimony to the first-degree murder prosecution. See *State v. McClain, supra* at 177, 81 S.E. 2d at 368. We believe this test has been met. *See generally* E. Cleary, McCormick on Evidence § 185 (1972). Even assuming, *arguendo,* that the admission of

this testimony was error, the error was clearly harmless. "Where there is abundant evidence to support the main contentions of the State, the admission of evidence, even though technically incompetent, will not be held prejudicial when defendant does not affirmatively make it appear that he was prejudiced thereby or that the admission of the evidence could have affected the result. [Citations omitted.]" *State v. Williams, supra* at 89, 165 S.E. 2d at 489. *Accord, Gasque v. State,* 271 N.C. 323, 340, 156 S.E. 2d 740, 752 (1967) ; *State v. Temple,* 269 N.C. 57, 66, 152 S.E. 2d 206, 212 (1967). These assignments are therefore without substance and hence without merit. They are overruled.

[6]   Defendant next contends (Assignment No. 4) that the trial court committed prejudicial error in allowing the State's motion to strike certain testimony and in instructing the jury to disregard that testimony.

The following occurred on re-cross examination of the State's witness Wandzillak:

"I had the impression that Samples had thought Watson was scared when he was lying on top of his bunk on his back. In crossing the corridor it was not a casual walk but a rush.

"Q. How would you describe it?

"A. Spirit of the moment.

"MR. MITCHELL : Objection, motion to strike.

"COURT: Allowed. You may disregard that answer of the witness."

Defendant argues that the above statement was admissible as either a shorthand statement of the facts, or as lay testimony on the mental capacity and condition of the defendant. We agree. Opinion evidence is always admissible when the facts on which the opinion or conclusion is based cannot be so described that the jury will understand them sufficiently to be able to draw their own inferences. *See* 1 Stansbury, N. C. Evidence § 125 (Brandis Rev. 1973), and numerous cases cited therein. However, any error there may have been in sustaining the objection and motion to strike is not deemed sufficiently prejudicial to justify the award of a new trial. *Cf. State v. Gray,* 268 N.C. 69, 84, 150 S.E. 2d 1, 12 (1966).

**[7]** In his next two assignments (Nos. 9 and 28) defendant contends that the trial court erred in charging the jury in violation of G.S. 1-180 by an imperfect or an incorrect summation of the evidence. Specifically, defendant excepted to the following italicized portions of the charge:

> "That shortly prior to that time Mr. Watson and Mr. Samples had been first talking and later arguing, as I recall the evidence, sitting on Mr. Watson's bunk; that Mr. Samples left Mr. Watson's bunk and went to his bunk *procuring a cigarette from another inmate on the way and lay on his bunk smoking the cigarette up to and after the time when the lights went off; that at some period of time, variously testified as between four and ten minutes after Mr. Samples left the immediate presence of Mr. Watson and after the lights had been dimmed, Mr. Watson left his bunk, went over to Mr. Samples' bunk* and was seen to strike anywhere from eight to ten blows with his fist clinched as if it were a hammer, toward the chest area of Mr. Samples; . . . "

Defendant contends that the above charge contains two errors, to wit: (1) it implies that Samples had in fact withdrawn from the controversy and retired for the evening; and (2) it misstated the time interval between Samples' departure from defendant's bunk and defendant's subsequent attack upon Samples. These contentions have no merit. Our reading of the charge reveals no implication that the deceased, Samples, had "withdrawn from the controversy and retired for the evening." The judge was merely summarizing the evidence as he is required to do. G.S. 1-180. As to the second alleged error, it is conceded that the court may have misstated the time element as the evidence tended to show a two-to-ten minute interval as opposed to a four-to-ten. However, the record does not disclose that this error in the court's review of the evidence was brought to the attention of the court so that it could have been corrected. Generally, an inadvertence in recapitulating the evidence must be called to the trial court's attention in time for correction and will not be held reversible error when this is not done. *See, e.g., State v. Lampkins,* 286 N.C. 497, 506, 212 S.E. 2d 106, 111 (1975) ; *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968) ; *State v. Feaganes,* 272 N.C. 246, 158 S.E. 2d 89 (1967). *See also* 3 Strong, N. C. Index 2d, Criminal Law § 113 (1967). In any event, this misstatement is of little consequence since it mainly

related to the elements of premeditation and deliberation and defendant was found not guilty of first-degree murder.

We have closely examined all the assignments brought forward in defendant's brief and conclude that he has had a fair trial, free from prejudicial error.

No error.